IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

CALVIN JORDAN et al.,                )
                                     )
        Plaintiffs,                  )
                                     )        NO. 3:18-cv-01233
v.                                   )        JUDGE RICHARDSON
                                     )
MATHEWS NISSAN, INC.,                )
                                     )
        Defendant.                   )

## MEMORANDUM OPINION

Pending before the Court is Defendant's Motion for Summary Judgment (Doc. No. 36, "Motion"), supported by an accompanying memorandum of law (Doc. No. 37, "Memorandum"). Plaintiffs have filed a response (Doc. No. 42), and Defendant filed a Reply (Doc. No. 44). This matter is ripe for review.

For the reasons discussed, the Motion will be granted in part and denied in part.

## BACKGROUND[1]

---

[1] Unless otherwise noted, the facts in this section are taken from facts in the Complaint that are not disputed and the Plaintiffs' Response to Statements of Undisputed Facts (where the facts are undisputed) and Defendant's Response to Additional Statements of Facts. (*See* Doc. Nos. 1, 42, 45). The Court qualifies some facts as being "claimed" by a particular side (and thus not necessarily undisputed). Because many facts are in dispute in this case, the Court has attempted to lay out the disputes of fact by showing each party's claimed version of the events.

Additionally, the Court notes that Plaintiffs cite to the sworn statement of Devan Floyd in their Responses to the Defendant's Statement of Undisputed Material Facts. Plaintiffs previously contested this statement since it was taken without notice to the Plaintiffs. (Doc. No. 30 at 2). Defendant's Motion for a Protective Order in regards to Mr. Floyd's statement was denied by the Magistrate Judge during discovery in this case, and subsequently a copy of the statement was provided to Plaintiffs. (Doc. No. 35). Despite citing to the statement, Plaintiffs did not attach a copy for the Court to their Response to Statements of Undisputed Facts. Defendant provided the Court with a copy of Mr. Floyd's statement attached to its Reply. (Doc. No. 44-1). The Court will consider this document when ruling on the Motion, as the parties appear to both now agree that the statement is properly in the record and appropriate for consideration by the Court. However,

1

Plaintiffs Jordan, Brown, and Condrey (collectively "Plaintiffs") were all employed as car salesmen at Mathews Nissan during parts of June and July 2018. (Doc. No. 42 ¶ 1). Car sales at Mathews Nissan are divided into "used" and "new" categories, and the two types of cars have separate lots and salesmen. Plaintiffs Brown and Condrey worked as used car salesmen, and Plaintiff Jordan worked as a new car salesman. (*Id.* at ¶ 2). All three Plaintiffs were hired by Matthew Hall, a new-cars sales manager: Plaintiff Condrey began employment on June 25, 2018, Plaintiff Jordan began employment on June 27, 2018, and Plaintiff Brown began on July 3, 2018. (Doc. No. 45 at ¶¶ 4, 5; Doc. No. 36-7 at 14).[2] Plaintiffs Jordan and Brown are African American individuals. (Doc. No. 42 at ¶ 3). Plaintiff Condrey identifies as American Indian and Native American,[3] and he is married to an African American woman. (Doc. No. 45 at ¶ 4; Doc. No. 45 at ¶ 1).

A. <u>The First Altercation Involving Plaintiff Brown</u>

On Plaintiff Brown's first day of work at Mathews Nissan, he was involved in an altercation with another salesman, Ralph Garner. (Doc. No. 42 at ¶ 5). Mr. Garner is an African American individual, a long-time employee, and a "top salesman" of new cars at Mathews Nissan. (*Id.* at ¶ 6, 7). Plaintiff Brown was speaking with Plaintiff Jordan at the new-car building (not the used-car building, where Plaintiff Brown worked) when Plaintiff Brown was approached by a customer

---

[1] Plaintiffs use a considerable portion of their Additional Statement of Facts describing the circumstances of Mr. Floyd's employment and termination. Though some of these facts are relevant (as outlined below), Mr. Floyd is not a party to this action, and the Court finds much of the information related to Mr. Floyd to be irrelevant.

[2] Defendant states that Plaintiffs were hired "in or about June 2018," and provided the exact dates in its response to Plaintiffs' interrogatories. Plaintiffs do not dispute the dates they began their employment with Defendant. (Doc. No. 45 at ¶ 5).

[3] It is disputed whether Plaintiff Condrey's heritage is common knowledge. (Doc. No. 45 at ¶ 27).

asking about a car. (*Id.* at ¶ 8). As Plaintiff Brown and the customer walked towards the car lot, Plaintiff Brown heard "screaming and yelling and cussing" as Mr. Garner walked toward him. (*Id.* at ¶ 9). Mr. Garner then hit Plaintiff Brown in the face with his elbow, caused Plaintiff Brown to hit his head, told Plaintiff Brown to go back to the used car area, and called Plaintiff Brown a "nigger."[4] (*Id.* at ¶ 10; Doc. No. 45 at ¶ 7, 8, 9).

Mathews Nissan's General Manager Terry Yarbrough, a Caucasian[5] individual, went outside to check on the confrontation. (Doc. No. 45 at ¶ 2). Plaintiffs and Defendant present different accounts of Mr. Yarbrough's conduct in breaking up the altercation. Defendant claims that Mr. Yarbrough merely instructed the two men to return to their respective buildings, but Plaintiffs claim that Mr. Yarbrough used racial slurs and threatened to fire Plaintiff Brown. (Doc. No. 42 at ¶ 11, 12). Specifically, Plaintiffs claim that Mr. Yarbrough said "nigga, boy, I don't give a shit what you niggas do," "y'all boys need to separate," and threatened to fire Plaintiff Brown.[6]

---

[4] The instant case requires the Court to wrestle with, among other things, a word (and its variants) that is widely—although, remarkably, not universally—reviled, perhaps more than any other word in the English language. It is the "n-word"—a word that, for reasons so obvious the Court need not even mention them—seems to bring division, anger and offense wherever it rears its head. And so it is in this case. Throughout this opinion, the Court will use the "n-word," as opposed to the full word. When quoting directly from what Plaintiffs claim Defendant's employees said, the Court will recount the language used as set forth by the evidence, as the word was used in different contexts and different variations. The Court will not dwell on the evils associated with this word or any variant thereof. Suffice it to say that the Court can bring itself to put the word down on paper only out of a sense of obligation to convey, without sugar-coating, the facts of this case and the Court's resolution of the issues with the requisite candor and clarity.

[5] The Court uses the terms "Caucasian" and "white" interchangeably, generally choosing the term that the parties (or their filings) or witness (in deposition testimony) used in the particular context being discussed.

[6] Though Defendant disputes Plaintiffs' claims that Mr. Yarbrough used racist terms, they do not seem to specifically deny that Mr. Yarbrough threatened to fire Plaintiff Brown. In disputing the racist terms, Defendant also seems to rely on Plaintiff Brown's credibility (such as noting that he was "hot" and does not remember everything that he said) to dispute the statement. The Court's role in ruling on a motion for summary judgment is not to rule on the credibility of facts. *Hostettler*

3

(Doc. No. 42 at ¶ 16; Doc. No. 45 at ¶ 10, 12, 14). Mr. Yarbrough denies having used any racist terms. (Doc. No. 42 at ¶ 17; Doc. No. 45 at ¶ 10-14, 18). After speaking with Plaintiff Brown, Mr. Yarbrough then returned inside and gave Mr. Garner a verbal reprimand. (Doc. No. 42 at ¶ 18). Mr. Yarbrough did not speak with Plaintiff Brown further, and Plaintiff Brown was not given a reprimand. (*Id.* at ¶ 19).

B. <u>General Discriminatory Conduct in the Workplace</u>

1. *Racist Comments*

Plaintiffs assert that during their employment with Defendant, Mr. Yarbrough and Mr. Hall, who both held jobs as managers, frequently made racially discriminatory comments such as using the language "nigger," "nigga," "niggers," "niggas," and "boy." (*Id.* at ¶ 20).[7]

Plaintiffs and Defendant dispute whether Mr. Hall used the racist language in a derogatory way, but Defendant does not dispute that Mr. Hall used the language. (*Id.* at ¶ 21-23). Plaintiffs claim that they "constantly" heard Mr. Hall use the phrases "my nigger" and "that's my nigga" in the workplace and were offended, but Defendant claims that the racist language occurred while playing Fortnite (an online video game) with an African American co-worker Mr. Hall was friends with, that the language was not directed at Plaintiffs, and that the language was a "term of endearment." (Doc. No. 42 at ¶¶ 21, 22; Doc. No. 45 at ¶ 21).

As for Mr. Yarbrough, Plaintiff Condrey heard Mr. Yarbrough use the "n-word" (Plaintiff Condrey used the shorthand but was referring to Mr. Yarbrough using the full word) on one

---

*v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). The Court therefore disregards Defendant's arguments (here and in other instances throughout briefing) that its facts are more accurate or credible than the facts presented by Plaintiffs.

[7] Defendant includes this statement in its Undisputed Statement of facts, but then later claims that Plaintiffs alleged only isolated incidents of a few individuals using racially discriminatory comments. Plaintiffs dispute that the use of racist terms was isolated to a few incidents. (Doc. No. 42 at ¶¶ 35, 36).

4

occasion while overhearing a conversation, though he never heard Mr. Yarbrough use the word "boy." (Doc. No. 42 at ¶¶ 29, 32). Plaintiffs Brown and Jordan told Plaintiff Condrey that they had heard Mr. Yarbrough use the "n-word." (Doc. No. 45 at ¶ 19). Defendant states that Plaintiffs Brown and Jordan made no specific additional allegations of the use of racially derogatory terms by Mr. Yarbrough, but Plaintiffs dispute this and say they repeatedly heard the use of such terms. (Doc. No. 42 at ¶ 35).

Plaintiffs heard other co-workers in the workplace (in addition to Mr. Yarbrough and Mr. Hall) make racist, derogatory comments. (*Id.* at ¶ 36). Another salesman called Plaintiff Condrey "Squanto" and "Chief", terms he found offensive because he identifies as Native American. (Doc. No. 42 at ¶¶ 33-34; Doc. No. 45 at ¶ 26). Plaintiff Jordan heard Caucasian salesmen laughing at Plaintiff Condrey because his wife is an African American individual and also heard the term "Squanto" used in connection with Plaintiff Condrey. (Doc. No. 42 at ¶ 34; Doc. No. 45 at ¶ 25). Additionally, Mr. Garner was generally known around the dealership as the "field nigga" who received sales leads from management, while the Caucasian employees who received sales leads were the "house mouse" salesmen (apparently known as such because they got "all the cheese" from the general manager). (Doc. No. 42 at ¶¶ 38, 39; Doc. No. 37 at 5 n.1).

Under Defendant's policies, Plaintiffs reported the racial harassment and discrimination to their supervisors and to human resources.[8] (Doc. No. 45 at ¶¶ 29, 30, 31). Plaintiff Condrey additionally emailed Sheila Yarbrough, a fellow employee and the ex-wife of Mr. Yarbrough, the day before leaving his employment with Defendant to complain about the hostile work

---

[8] Defendant disputes that every comment was reported and claims that the incidents of laughing at Plaintiff Condrey due to his African American wife and calling him "Chief" and "Squanto" were never reported. (Doc. No. 45 at ¶¶ 25, 26).

environment, the lack of investigation, and the lack of response to Plaintiffs' complaints of racist conduct in the workplace, to which Ms. Yarbrough responded there "had been no response or investigation of the issues."[9] (*Id.* at ¶¶ 74, 79).

### 2. *Disparate treatment*

Plaintiffs point to various situations where they allegedly faced disparate treatment based on their race: being paid less than non-African American employees, not being paid (unlike non-African American employees) what they had earned, not being provided bonuses that were provided to non-African American employees, not receiving leads (mainly Internet leads) that non-African American employees received, and being threatened with discharge or reduction in pay and earning opportunities. (Doc. No. 42 at ¶ 37).

Defendant maintains an Internet sales department, which is separate from the new and used car salesmen, which is made up of five internet managers, including four Caucasian employees and one African American individual. (Doc. No. 42 at ¶¶ 43, 44). Plaintiffs never applied for positions with the Internet sales department. (*Id.* at ¶ 45). Defendant claims that Internet leads are directed to and handled by this department, and not given to new and used car salesman (such as Plaintiffs). (*Id.* at ¶ 46). Plaintiffs dispute this, claiming that Defendant's managers directed Internet leads to car salesman, specifically to Caucasian salespersons only. (*Id.* at ¶ 46). Plaintiffs additionally claim that they were not given log-in credentials for the Customer Relationship Management ("CRM") database, which would have given them access to E-leads (*Id.* at ¶ 47). However, Defendant states the CRM system was just a system to enter customers' information for

---

[9] Defendant disputes Plaintiff Condrey's statement that he emailed Ms. Yarbrough and received an unsatisfactory response, but it does so based on the same objection that it made as to the reporting of racist conduct and statements by Plaintiff Brown, not Plaintiff Condrey, and it points the Court to no facts that place in dispute the fact that *Plaintiff Condrey* emailed this complaint to Ms. Yarbrough. (Doc. No. 45 at ¶ 74).

6

follow-up visits, not a system to distribute leads. (*Id.* at ¶ 50). Plaintiffs dispute this characterization, and they also argue that lacking credential to the CRM system deprived them of an important tool they needed to do their jobs well. (*Id.*). Defendant's records show that all three Plaintiffs had credentials to access the CRM system. (*Id.* at ¶ 48). The records show that Plaintiff Brown last logged in in July 2018, which Plaintiffs dispute. (*Id.* at ¶ 49). Plaintiffs instead claim that they asked repeatedly for, but were never given, log-in credentials. (Doc. No. 45 at ¶¶ 37, 39).

In addition to the Internet leads, Plaintiffs claim that two Caucasian salesmen were given leads to make sales, while Plaintiff Brown never received a sales lead.[10] (Doc. No. 45 at ¶¶ 35, 36). Defendant disputes this, claiming that Plaintiff Brown acknowledged that he could have picked up lunch or done other favors for the sales managers in order to get leads as other salespersons had done, and that Mr. Garner, an African American individual, received leads. (*Id.*). Plaintiff Brown admitted that Mr. Garner "grinded" to sell cars and get opportunities at the dealership. (Doc. No. 42 at ¶ 40). Plaintiff Brown also admitted that he could have gotten leads if he picked up lunch or did favors for sales managers. (*Id.* at ¶ 41).

Mr. Yarbrough continuously took customers away from Plaintiff Brown and gave them to Caucasian salespeople.[11] (Doc. No. 45 at ¶ 34). Mr. Garner stole ("skated") two of Plaintiff Jordan's customers, and one of Plaintiff Condrey's leads was stolen by another salesman. (Doc. No. 42 at ¶¶ 54, 55). Plaintiff Brown claims that he was paid incorrect commissions for two sales, but the parties dispute whether the sales records reflect that the appropriate commission was paid.

---

[10] Although Defendant purports to dispute Plaintiffs' claim of the accuracy of the facts set forth in the sentence to which this footnote is appended, (Doc. No. 45 at ¶ 35), Defendant does not seem to dispute the accuracy of the claimed facts so much as to cabin them and make clear their limitations in presenting the overall picture of what happened with respect to leads.

[11] Defendant disputes this statement, but in disputing the statement Defendant merely describes its account of the events surrounding Plaintiff Brown's firing.

(*Id.* at ¶ 51). Defendant states that Mr. Yarbrough offered to pay Plaintiff Brown an extra $500 to appease him, which Plaintiffs dispute. (*Id.* at ¶ 52). Neither Plaintiff Condrey nor Plaintiff Jordan claims that he sold vehicles and then did not receive the proper commission. (*Id.*).

C. The "Monkey and Noose" incident[12]

Plaintiffs Brown and Condrey shared a sales desk in the used car department. (Doc. No. 42 at ¶ 59). On July 16, 2018,[13] Plaintiff Brown left a customer with Plaintiff Condrey at the shared desk and walked up to the manager's desk. (*Id.*). Plaintiff Condrey claims that, while looking for a business card in the desk drawer, he found a toy monkey with a noose around its neck and pulled it out in front of the customer. (*Id.* at ¶ 61). Plaintiff Condrey showed the monkey to Plaintiff Brown and took a photo of it. (*Id.* at ¶ 62).

Plaintiff Brown claims that he took the monkey and noose to show two sales managers, (*Id.* at ¶ 63). Additionally, Plaintiff Brown and Plaintiff Condrey told various people at Mathews Nissan about the incident. (Doc. No. 45 at ¶¶ 42, 43). Plaintiff Brown also sent an email to Ms. Yarbrough with a picture of the monkey. (Doc. No. 42 at ¶ 64).

---

[12] After the incident described in this subsection, a former employee, Devan Floyd, called Ms. Yarbrough and claimed that the entire monkey incident had been fabricated by Plaintiffs, a contention that Plaintiffs dispute. (Doc. No. 42 at ¶ 71). Mr. Floyd claimed that he was instructed by Plaintiffs Brown and Jordan to buy the monkey at a Dollar Tree (one not near the dealership) and to pay cash. (Doc. No. 42 at ¶ 72). Defendant subpoenaed sales records from a Dollar Tree where Mr. Floyd said the monkey was purchased, and the records revealed that a monkey and jump rope had been purchased with cash during the time period described by Mr. Floyd. (*Id.* at ¶ 75). According to Mr. Floyd, Plaintiffs Brown and Jordan, as well as Mr. Floyd, then went to Mr. Floyd's apartment to cut the handles off a jump rope and place the noose around the monkey's neck. (*Id.* at ¶ 73). Mr. Floyd further contended that Plaintiff Brown's role was to place the monkey and noose in a drawer during a sales meeting, so that Plaintiff Condrey could pull it out in front of a customer. (*Id.* at ¶ 74). Plaintiffs dispute Mr. Floyd's claim that the incident involving the monkey and noose was fabricated. (*Id.* at ¶¶ 72-74; Doc. No. 45 at ¶ 82). The Court cannot resolve factual disputes or weigh credibility when ruling on a motion for summary judgment. This factual dispute is better left for the jury.

[13] Plaintiff Condrey notes that this was the day after his African American wife (then-fiancée) came to the dealership to pick up his paycheck for him. (Doc. No. 41 at 11).

It is disputed to what extent Defendant investigated this incident. (*Id.* at ¶¶ 67, 69, 70). Defendant claims that Ms. Yarbrough made Mr. Yarbrough aware of the situation and that Mr. Yarbrough promptly met with Plaintiff Brown the following day. (*Id.* at ¶ 67). Plaintiffs claim that Ms. Yarbrough responded that she was not the one who placed the monkey in the desk and asked "what [do] you want me to do?" (Doc. No. 45 at ¶ 46). Plaintiffs claim that Defendant never indicated it was doing an investigation, but Defendant claims actions were taken. (*Id.* at ¶¶ 47, 48). It is undisputed that Mr. Yarbrough met with his managers to see what if anything they knew about the incident, but no one knew anything. (Doc. No. 42 at ¶ 68). After Plaintiffs Brown and Jordan left the dealership and made their announcement that they would be filing EEOC charges (discussed below), Mr. Yarbrough took additional statements at a July 20 sales meeting. (*Id.* at ¶¶ 69, 70; Doc. No. 45 at ¶¶ 51, 75). At this meeting, Mr. Hall noted Plaintiff Condrey's complaints of racial discrimination and harassment on a paper plate and then obtained just a few sentences from four other employees. (Doc. No. 45 at ¶ 75).

D. Plaintiff Brown's Second Altercation

On July 17, 2018 (the day after the monkey and noose incident), Mr. Yarbrough took a meeting with a customer who was uncomfortable because she had been quoted two different prices for a used car by two different salesmen, one of whom was Plaintiff Brown. (Doc. No. 42 at ¶¶ 77, 78, 79). Mr. Yarbrough was in the meeting with the customer when Plaintiff Brown entered and accused Mr. Yarbrough of stealing his customers and giving them to Mr. Garner. (*Id.* at ¶¶ 79, 81). Plaintiff Brown then left Mr. Yarbrough's office, and Mr. Yarbrough followed him outside. (*Id.* at ¶¶ 83, 84).

Plaintiffs and Defendant dispute much of the rest of the circumstances surrounding this incident and Plaintiff Brown's firing.

Plaintiffs and Defendant dispute whether Plaintiff Brown used profanities when he accused Mr. Yarbrough in front of the customer, after he went outside of Mr. Yarbrough's office, and in reference to Ms. Yarbrough when she came outside to check on the situation after hearing the confrontation from her office. (*Id.* at ¶¶ 80-83, 85, 87, 88). Plaintiff Brown maintains that he did not use profanities, but Defendant claims that Plaintiff Brown shouted profanities throughout the incident.

In Plaintiffs' version of the events, Mr. Yarbrough and other Caucasian individuals surrounded Plaintiff Brown to try to provoke him, and Mr. Hall put his hands on Plaintiff Brown. (Doc. No. 45 at ¶ 53). There was another African American employee present, but Mr. Yarbrough made him (but not any of the Caucasian employees) leave.[14] (*Id.* at ¶ 54). When Mr. Yarbrough fired Plaintiff Brown, he stated, "You need to get your black ass off my damn dealership, boy." (Doc. No. 45 at ¶ 57). When Plaintiff Brown asked what Mr. Yarbrough had said, Mr. Yarbrough stated, "You heard me nigga. You're fired." (*Id.*). When Plaintiff Brown asked why he was fired, Mr. Yarbrough stated "[i]nsubordination." (*Id.*). Plaintiff Brown claims that Mr. Yarbrough called him "boy" and "nigga" during the incident. (Doc. No. 42 at ¶ 26). Plaintiff Jordan remembers Mr. Yarbrough calling Plaintiff Brown "boy" multiple times, but he does not remember Mr. Yarbrough using the "n-word" that day. (Doc. No. 42 at ¶ 25; Doc. No 45 at ¶ 54).

Mr. Yarbrough does not dispute that Plaintiff Brown was fired, but he disputes that he used any racist language. (*Id.* at ¶ 27). Defendant notes that a video of the altercation does not show Mr.

---

[14] Though Defendant indicates that it disputes the substance of the sentence to which this footnote is appended, Defendant provides only a general recitation of its account of Plaintiff Brown's firing without specifically addressing this fact. Therefore, the Court accepts this statement as undisputed for purposes of the present Motion.

Yarbrough making these comments, but Plaintiffs dispute that the entire altercation was filmed. (*Id.* at ¶ 28).

Plaintiff Jordan is the one who filmed the incident. (Doc. No. 42 at ¶ 91). Plaintiff Jordan claims that he was fired for filming the incident, but Defendant claims that Plaintiff Jordan simply left with Plaintiff Brown and did not return. (*Id.* at ¶ 92). Plaintiffs claim that Plaintiff Jordan walked Plaintiff Brown to his car, but upon returning to the lot was fired by Mr. Yarbrough, who said "[y]ou're fired, you can leave, too." (Doc. No. 45 at ¶ 59). However, Defendant claims that Plaintiff Jordan simply never returned. (*Id.*). The video does not show Plaintiff Jordan being fired, and Plaintiffs maintain that the video does not reflect the entire incident. (Doc. No. 42 at ¶ 93).

Three days after the incident, on July 20, 2018, Plaintiff Condrey stood up in a sales meeting to address the hostile work environment at Mathews Nissan; he then resigned his employment and had an exit interview. (Doc. No. 42 at ¶¶ 94-96). Plaintiff Condrey stated that he felt like he had no other option than to resign due to the racism present in the work environment. (Doc. No. 45 at ¶¶ 77, 78).

Plaintiffs filed their Complaint in November 2018. They brought an action for damages and equitable relief for unlawful employment practices under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("Section 1981"), and the Tennessee Human Rights Act ("THRA"). (Doc. No. 1 at 1-2). Plaintiffs' Complaint alleges various circumstances and events that are racially charged in nature, but Plaintiffs' exact theories of relief are not clearly delineated in their Complaint. Plaintiffs mention "racially disparate treatment," a "hostile work environment," "racial harassment," "retaliation," and generally the events surrounding their terminations as their causes of action. (*Id.*). Defendant interprets the Complaint as bringing four distinct claims: 1) disparate pay/treatment; 2) discriminatory termination; 3) retaliation, and 4) hostile work

environment. (Doc. No. 37 at 12). Plaintiff does not seem to dispute this characterization of their causes of action, and the Court will structure its opinion accordingly.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. *See id.* at 248. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine[.]'" *Id.*

A fact is "material" within the meaning of Rule 56(c) "if its proof or disproof might affect the outcome of the suit under the governing substantive law." *Anderson*, 477 U.S. at 248. A genuine dispute of material fact exists if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Harris v. Klare*, 902 F.3d 630, 634-35 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record that demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018). If the summary judgment movant meets that burden, then in response the non-moving party must set forth specific facts showing that there is a genuine issue for trial. *Id.* at 628.

A party asserting that a fact cannot be or genuinely is disputed—*i.e.*, a party seeking summary judgment and a party opposing summary judgment, respectively—must support the

assertion by citing to materials in the record, including, but not limited to, depositions, documents, affidavits or declarations. Fed. R. Civ. P. 56(c)(1)(A). In reviewing a motion for summary judgment, this court must view the evidence in the light most favorable to the non-moving party. *Tlapanco v. Elges*, 969 F.3d 638, 647 (6th Cir. 2020) (quoting *Anderson*, 477 U.S. at 248). Likewise, the court should view the facts and draw all reasonable inferences in favor of the non-moving party. *Pittman*, 901 F.3d at 628. Credibility judgments and weighing of evidence are improper. *Hostettler v. College of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As noted above, where there is a genuine dispute as to any material fact, summary judgment is not appropriate. *Id*. The court determines whether sufficient evidence has been presented to make the issue of fact a proper jury question. *Id*. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence upon which the jury could reasonably find for the non-moving party. *Rodgers v. Banks*, 344 F.3d 587, 595 (6th Cir. 2003).

On a motion for summary judgment, a party may object that the supporting materials specified by its opponent "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). Upon such an objection, the proponent of the supporting material must show that the material is admissible as presented or explain how it could be presented in a form that would be admissible. *Thomas v. Haslam*, 303 F. Supp. 3d 585, 624 (M.D. Tenn. 2018); *Mangum v. Repp*, 2017 WL 57792 at **5 (6th Cir. Jan. 5, 2017) (citing Fed. R. Civ. P. 56(c) advisory committee's note to 2010 amendment).

## DISCUSSION

Defendant argues that it is entitled to summary judgment on all of Plaintiffs' claims, namely: 1) disparate pay/treatment, 2) discriminatory termination, 3) retaliation, and 4) hostile

13

work environment. (Doc. No. 37). As noted above, Plaintiffs bring each of these four claims pursuant to Title VII of the Civil Rights Act of 1964 ("the Civil Rights Act"), 42 U.S.C. § 1981, and the Tennessee Human Rights Act ("THRA"). Courts use the same framework for analyzing all four of Plaintiffs' claims under the three statutes, so the Court need only conduct one analysis of each claim.[15] *Frazier v. Phillip's Masonry Grp., Inc.*, No. 1:09-0022, 2010 WL 1882123, at \*6 (M.D. Tenn. May 11, 2010); *Pendleton v. Bob Frensley Chrysler Jeep Dodge Ram, Inc.*, No. 3:14 C 02325, 2016 WL 2927983, at \*\*3, 8, 10 (M.D. Tenn. May 19, 2016).

The Court will address each of Plaintiffs' claims in turn.

A. Disparate Pay

In their Complaint, Plaintiffs bring a claim for disparate treatment based on being paid less than Caucasian employees. (Doc. No. 1 at ¶ 21). Defendant argues in its Reply that Plaintiffs have waived this claim, as Plaintiffs' "Response is devoid of any discussion or analysis of this claim, and Plaintiffs have therefore tacitly conceded that Defendant is entitled to summary judgment on this issue." (Doc. No. 44 at 1). Though Defendant provides no citation for this assertion, the Sixth Circuit has held that "[t]his Court's jurisprudence on abandonment of claims is clear: a plaintiff is

---

[15] The THRA provides a state remedy for race discrimination. The statute states "[i]t is a discriminatory practice for an employer to: (1) Fail or refuse to hire or discharge any person or otherwise to discriminate against an individual with respect to compensation, terms, conditions or privileges of employment because of such individual's race, creed, color, religion, sex, age or national origin . . . " Tenn. Code Ann. § 4-21-401(a)(1). Though this is a state discrimination law, courts apply the same principles as they would to a claim brought under Title VII or 42 U.S.C. § 1981. *See e.g.*, *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 31 (Tenn. 1996) ("The stated purpose and intent of the Tennessee Act is to provide for execution within Tennessee of the policies embodied in the federal civil rights laws. Accordingly, our analysis of the issues in this appeal is the same under both the Tennessee Human Rights Act and Title VII of the Federal Civil Rights Act." (internal citations omitted)). It is true that the THRA is broader than Title VII in some respects, *Walton v. Interstate Warehousing, Inc.*, No. 3:17-cv-1324, 2020 WL 1640440, at \*5 (M.D. Tenn. Apr. 2, 2020), but not any that are relevant to the analysis in this case.

14

deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown v. VHS of Michigan, Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013).

Despite Defendant's claim that Plaintiffs do not include any discussion of their disparate pay claims, Plaintiffs do include a discussion of the facts regarding their disparate pay claims under the heading "Additional Disparate Treatment." (Doc. No. 41 at 5). Though Plaintiffs do not devote a section of their brief to disparate pay, they reference it throughout briefing. Therefore, the Court does not find that Plaintiffs have abandoned their disparate pay and treatment claim, though they certainly have not provided the Court fulsome briefing. *See Tartt v. Wilson Cty., Tenn.*, 982 F. Supp. 2d 810, 820 (M.D. Tenn. 2013), *aff'd sub nom. Tartt v. Wilson Cty., Tennessee*, 592 F. App'x 441 (6th Cir. 2014) ("The Court notes that it is not entirely clear that [Plaintiff] also brings a disparate-treatment claim. Nevertheless, for the sake of completeness in resolving the remaining claims in this case, the Court will analyze [Plaintiff's] disparate-treatment claim." (internal citations omitted)).

Regardless of this confusion in briefing, the Court finds that Defendant is entitled to summary judgment on Plaintiffs' claims for disparate pay. The Court will discuss Plaintiffs' claims of disparate treatment based on unequal pay first, before moving on to Plaintiffs' claims for disparate treatment/termination. Though these will be discussed separately, the same legal framework applies for analyzing both types of disparate treatment claims.

15

1. *Standards for analyzing disparate treatment[16] claims*

Title VII of the Civil Rights Act makes it illegal for an employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).

To survive a defendant's motion for summary judgment ruling on a Title VII claim for disparate treatment, a plaintiff may seek to raise a genuine issue of material fact by offering either direct evidence of discrimination or indirect (*i.e.*, circumstantial) evidence of discrimination in accordance with the familiar so-called *McDonnell Douglas* burden-shifting framework. "Under either method, summary judgment is inappropriate if plaintiff proffers evidence from which an inference of intentional discrimination can be drawn." *Pendleton*, 2016 WL 2927983, at *3.

a. Indirect evidence (McDonnell Douglas)

The Sixth Circuit has summarized the applicability and workings of the *McDonnell Douglas* burden shifting framework as follows:

> A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by

---

[16] "Disparate treatment" is an umbrella term used to refer to discrimination against an employee based on the employee's membership in a protected class. As the Supreme Court has explained:

> Several of our decisions have dealt with the evidentiary standards that apply when an individual alleges that an employer has treated that particular person less favorably than others because of the plaintiff's race, color, religion, sex, or national origin. In such "disparate treatment" cases, which involve "the most easily understood type of discrimination," *Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S. Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977), the plaintiff is required to prove that the defendant had a discriminatory intent or motive.

*Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 985–86 (1988) (distinguishing disparate treatment from disparate impact cases). When the Court refers to "disparate pay," it is referring to a specific type of disparate treatment claim brought by Plaintiffs in this case. *Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 549 (6th Cir. 2006) (referencing a "pay disparity" claim).

16

presenting indirect evidence under the framework first set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

> To succeed under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination by a preponderance of the evidence. . . . Once the plaintiff makes out a *prima facie* case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination.

*Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606–07 (6th Cir. 2019) (citations omitted).

Therefore, if only indirect (and no direct) evidence is present, the plaintiff bears the burden under *McDonnell Douglas* of first showing its *prima facie* case of race discrimination, *i.e.*, that:

> 1) he is a member of a protected class; 2) he was qualified for his job and performed it satisfactorily; 3) despite his qualifications and performance, he suffered an adverse employment action; and 4) that he was replaced by a person outside the protected class or was treated less favorably than a similarly situated individual outside his protected class.

*Hughes v. Gen. Motors Corp.*, 212 F. App'x 497, 502 (6th Cir. 2007) (quoting *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 572–73 (6th Cir.2000)). If and when the plaintiff establishes a *prima facie* case, the burden shifts to the defendant to show some legitimate, non-discriminatory explanation for its action(s). *Edgar v. JAC Prod., Inc.*, 443 F.3d 501, 508 (6th Cir. 2006).

The Supreme Court has prudently cautioned, given the confusion sometimes discernible in this context, "[t]he nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens." *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253 (1981). As the Sixth Circuit recently explained:

> Establishing a prima facie case is not difficult, and it creates a "presumption that the employer unlawfully discriminated against the employee." *Wixson v. Dowagiac Nursing Home*, 87 F.3d 164, 169 (6th Cir. 1996) (quoting [*Burdine*, 450 U.S. at 254]). This presumption does not shift the burden of proof, but only the burden of producing some evidence of permissible motive. *See Burdine*, 450 U.S. at 256 n.8, 101 S. Ct. 1089.

17

*Harris v. City of Akron, Ohio*, 836 F. App'x 415, 419 (6th Cir. 2020).

Thus, as to the existence of legitimate and non-discriminatory reasons for its actions, the defendant bears only the burden of production and not the burden of persuasion. *Garren v. CVS Rx Servs., Inc.*, 482 F. Supp. 3d 705, 717 (E.D. Tenn. 2020) (citing *Anthony v. BTR Auto. Sealing Sys., Inc.*, 339 F.3d 506, 515 (6th Cir. 2003)).[17] To meet that burden of mere production, "the defendant need not persuade the court that it was actually motivated by the proffered reason[s]." *Burdine*, 450 U.S. at 254. Rather, "[i]t is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Id.* To raise such genuine issue, "the defendant must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection[, which] must be legally sufficient to justify a judgment for the defendant." *Id.* at 255. "The defendant only has to present [evidence of] 'clear and reasonably specific' reasons that will 'frame the factual issue with sufficient clarity so that the plaintiff will have a full and fair opportunity to demonstrate pretext.'" *Harris*, 836 F. App'x at 419 (quoting *Burdine*, 450 U.S. at 258).[18]

---

[17] As suggested herein, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains with the plaintiff at all times, throughout this burden shifting. *Burdine*, 450 U.S. at 253; *Anthony*, 339 F.3d at 515. The Court keeps this in mind, albeit with the caveat that on the instant Motion it does not sit as the trier of fact but instead concerns itself only with what a reasonable trier of fact could (or could not) find at a hypothetical trial based on the evidence presented on this Motion. Notably, in seeking to meet its burden, the plaintiff cannot rely purely on mere personal belief, conjecture and speculation, because they are insufficient to support an inference of discrimination. *Garren*, 482 F. Supp. 3d at 717.

[18] The bracketed words added by the Court to this quote are significant; they denote the difference between a burden (a) merely to *articulate* some non-discriminatory reason(s) that *supposedly* motivated the employment decision, and (b) to *provide some evidence* that there was some non-discriminatory reason(s). It is true that some cases use language that seemingly suggests that the burden is the former. *E.g., Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d at 607. But both *Burdine* and *Harris* (which, as noted was relying on *Burdine)* make clear that the employer meets

18

If the defendant carries its burden to show a legitimate nondiscriminatory reason, then finally the burden shifts back to the plaintiff to show that the reason offered by the defendant is a pretext. *McDonnell Douglas*, 411 U.S. at 802-04 (1973); *Burdine*, 450 U.S. at 255. This resulting burden is one of persuasion, and this burden of persuasion (as to pretext) at this stage "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Id.* at 256. In other words, once the burden has shifted back to the plaintiff, the plaintiff must show by a preponderance of the evidence[19] each of two components of pretext: that the defendant's reasons (i) were not its true reasons and (ii) were instead actually a pretext for discrimination. *Kirilenko-Ison v. Bd. of Educ. of Danville Indep. Sch.*, 974 F.3d 652, 661 (6th Cir. 2020). To defeat a summary judgment motion in such circumstances, the plaintiff must produce sufficient evidence from which the jury could reasonably reject the defendant's explanation and infer that the defendant intentionally discriminated against him. *Braithwaite v. Tinken Co.*, 258 F.3d 488, 493 (6th Cir. 2001).

An employee can show pretext "by offering evidence that (1) the employer's stated reason had no basis in fact, (2) the stated reason did not actually motivate the employer, or (3) the stated reason was insufficient to warrant the adverse employment action." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014). "Whichever method the plaintiff employs, he always bears the burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against

---

its burden of production only if it presents not merely some statement of what the reason supposedly was, but rather evidence of what the reason actually was.

[19] The "preponderance of the evidence" standard applicable here is the trial standard. At the summary judgment stage, as suggested above, the standard is modified, such that the question becomes whether a reasonable jury *could* make the required finding by a preponderance.

him.'" *Clark v. Walgreen Co.*, 424 F. App'x 467, 474 (6th Cir. 2011) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir.2003)).

"The three-part test need not be applied rigidly. Rather, '[p]retext is a commonsense inquiry: did the employer fire the employee for the stated reason or not?'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 285 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 n.4 (6th Cir. 2009)). "Ultimately the plaintiff must produce 'sufficient evidence from which a jury could reasonably reject [the employer's] explanation of why it fired [or failed to rehire] her.'" *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (quoting *Chen*, 580 F.3d at 400). The plaintiff "must meet this evidentiary burden by a preponderance of the evidence." *Id.* (citation omitted). If the plaintiff can do so, he meets his burden of showing that the employer's stated reason for the allegedly discriminatory reason was not its true reason.

But something more is required of the plaintiff. That is, the plaintiff must address the second component of pretext, *i.e.*, that the actual reason was discriminatory. That is, as indicated above, "[t]o demonstrate pretext, a plaintiff must show both that the employer's proffered reason was not the real reason for its action, and that the employer's real reason was unlawful."[20] *EEOC v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (citing *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993),[21] and *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 148

[20] The required second component seems to coalesce with the required overall showing that the plaintiff must make to meet his or her overall burden of showing unlawful discrimination. Presumably, this is what the Supreme Court had in mind when it stated that the plaintiff's burden as to pretext "merges" with the plaintiff's overarching burden as to the discrimination claim as a whole. *Burdine*, 450 U.S. at 256.

[21] One might reasonably ask whether *St. Mary's*, which as noted in *Ford Motor Co.* required the plaintiff to show both components, effectively overruled *Burdine* in one respect. Specifically, this aspect of *St. Mary's* seems in tension with *Burdine*'s statement that the plaintiff may meet its burden of persuasion as to pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered

20

(2000)).[22] In other words, if the burden has shifted back to the plaintiff, the plaintiff's trial burden would be to show by a preponderance of the evidence that the defendant's reasons were not its true reasons and were instead actually a pretext for retaliation. *Kirilenko-Ison*, 974 F.3d at 661. "To avoid summary judgment, then, the [plaintiff] must present evidence from which a reasonable jury could find that poor performance was not the real reason that [the defendant] terminated [the plaintiff], and that unlawful retaliation in fact was." *Ford Motor Co.*, 782 F.3d at 767. In some cases, the evidence that the defendant's proffered reason was not the proffered reason will serve equally as evidence that the real reason was discriminatory, and vice versa. After all, evidence may suggest that the defendant's proffered (non-discriminatory) reason was not the real reason precisely because it suggests that the real reason was discriminatory; likewise, evidence may suggest that the defendant's proffered (non-discriminatory) reason was discriminatory precisely because it suggests that (suspiciously) the proffered reason was not the real reason. But under Sixth Circuit law, the Court must be mindful to require evidence of both kinds, even if it turns out to all be the same evidence.

---

explanation is unworthy of credence." *Id.* at 256. The dissent in *St. Mary's* certainly saw the tension. But as far as the undersigned can tell, *Burdine* has never been considered to have been overruled in any respect, and certainly neither the Supreme Court nor the Sixth Circuit has shown any compunction about citing *Burdine* (at least parts of *Burdine* other than the statement apparently displaced by *St. Mary's* as noted above) in the aftermath of *St. Mary's*. The Court is confident at the very least that the aspects of *Burdine* upon which the Court relies remain good law after *St. Mary's*.

[22] One might ask why it is not enough to speak simply in terms of the requirement to show that the real reason was retaliation (the second component of pretext) without mentioning a separate requirement to show that the real reason was not the (non-retaliatory) reason proffered by Defendant (the first component of pretext). After all, the second seems necessarily subsumed in the first. But the Sixth Circuit has articulated these as separate requirements that each must be satisfied, and so the Court will proceed accordingly.

21

It is worth summarizing in some detail how all of these (variously shifting and conditional) requirements apply in the *summary judgment context* in particular, once the above-referenced principles of summary judgment are applied to the unique framework of indirect-evidence cases under *McDonnell Douglas*. The Sixth Circuit spoke very helpfully on this topic:

> [When a] discrimination plaintiff bases his case on indirect evidence (i.e., evidence requiring inferences to reach the conclusion that the defendant discriminated against the plaintiff), we apply the burden-shifting framework first set forth in *McDonnell Douglas v. Green,* 411 U.S. 792, 802–05, 93 S. Ct. 1817, 36 L.Ed.2d 668 (1973). *Rowan,* 360 F.3d at 547; *Town v. Mich. Bell Tel. Co.,* 455 Mich. 688, 568 N.W.2d 64, 67–68 (1997). "On a motion for summary judgment, a district court considers whether there is sufficient evidence to create a genuine dispute at each stage of the *McDonnell Douglas* inquiry." *Cline v. Catholic Diocese of Toledo,* 206 F.3d 651, 661 (6th Cir.2000) (applying the *McDonnell Douglas* framework to a sex-discrimination claim). Thus, the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination. *Monette v. Elec. Data Sys. Corp.*, 90 F.3d 1173, 1186 (6th Cir.1996) (applying the *McDonnell Douglas* framework to a disability-discrimination claim). The defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. *Id.* If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. *Id.* Although the burdens of production shift, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Tex. Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L.Ed.2d 207 (1981).

*Blair v. Henry Filters, Inc.*, 505 F.3d 517, 524 (6th Cir. 2007), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 179 (2009).[23]

---

[23] Although *Blair* states that "the plaintiff must first submit evidence from which a reasonable jury could conclude that he or she established a prima facie case of discrimination[,]" 505 F.3d at 524, this is actually true only if the defendant-movant met its initial burden of showing the absence of sufficient evidence for a jury to reach such a conclusion. *See Pittman v. Experian Information Solutions, Inc.*, 901 F.3d 619, 627-28 (6th Cir. 2018) ("The moving party must demonstrate the 'basis for its motion, and identify[ ] those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986))).

22

In the Court's view, what it boils down to, stated as concisely as possible (which, alas, is not particularly concisely), is set forth in the following paragraph.

To obtain summary judgment on Title VII or THRA claims grounded exclusively on the so-called "indirect-evidence" theory, the defendant must either (i) show that there is no genuine issue of material fact as to at least one of the elements of the plaintiff's *prima facie* case (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of that element); *or*, failing that, (ii) (a) make an evidentiary showing[24] that there was a legitimate, nondiscriminatory reason for its alleged actions and then (b) show that there is no genuine issue of material fact as to pretext (such that the defendant necessarily is entitled to judgment as a matter of law based on the absence of pretext). On the other hand, the plaintiff will avoid summary judgment if : (i) either (a) the defendant fails to meet its initial burden to show the lack of a genuine issue of material fact as to any or more elements of the plaintiff's *prima facie* case, *or* (b) the plaintiff presents sufficient evidence to demonstrate a genuine issue of material fact as to any element(s) of such *prima facie* case as to which the defendant met its initial burden to show the lack of a genuine issue of material fact; and (ii) either (a) the defendant cannot make an evidentiary showing of a legitimate, nondiscriminatory reason for its alleged actions, or, if the defendant can make such a showing, (b) the plaintiff demonstrates that there is a genuine issue of material fact as to pretext.[25]

---

[24] To be clear, the requirement here is not merely to *articulate* a legitimate reason, but also (as discussed below) to *present evidence* that the articulated legitimate reason was in fact the reason.

[25] As indicated below, courts' references to a plaintiff's requirement to show "pretext" is actually a requirement to show not just pretext (*i.e.*, that the claimed reason was provided to conceal the real reason) but also to show that the real reason was of an unlawful, discriminatory nature.

b. Direct evidence

As an alternative to indirect evidence, a plaintiff may seek to establish its case via direct evidence. "[D]irect evidence is evidence which, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor.'" *Bartlik v. U.S. Dep't of Labor*, 73 F.3d 100, 103 n.5 (6th Cir. 1996) (quoting *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1248 (6th Cir. 1995)). "Consistent with this definition, direct evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group." *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003). When there is direct evidence, "the existence of unlawful discrimination is 'patent.'" *Id.* "'Whatever the strength of the evidence, it is not "direct" evidence if [it] admits more than one plausible interpretation, and requires a significant inference or presumption on the part of the trier of fact." *Kocak v. Community Health Partners of Ohio, Inc.*, 400 F.3d 466, 470 (6th Cir.2005) (quoting *Norbuta v. Loctite Corp.*, 1 Fed. Appx. 305, 313 (6th Cir.2001)). If an inference is required to draw from the evidence the conclusion that an employer was animose against a protected class—for example, if an inference is required to reach the conclusion that a comment refers to a protected class or the plaintiff's membership in a protected class—then the evidence is not direct evidence. *Zivkovic v. Juniper Networks, Inc.*, 450 F. Supp. 2d 815, 825 (N.D. Ohio 2006).

"[T]he evidence must establish not only that the plaintiff's employer was predisposed to discriminate on the basis of [race], but also that the employer acted on that predisposition." *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 488 (6th Cir. 2000).

"Direct evidence of discrimination is rare because employers generally do not announce that they are acting on prohibited grounds." *Erwin v. Potter*, 79 F. App'x 893, 896–97 (6th Cir.

24

2003). "Circumstantial evidence, on the other hand, is proof that does not on its face establish discriminatory animus, but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003). "Direct evidence and circumstantial evidence claims run on parallel tracks, and therefore failure to sustain a claim under one framework does not undermine the other." *Erwin*, 79 F. App'x at 899.

Unlike in indirect evidence cases, which as noted always involve the *McDonnell-Douglas* framework, "[i]n direct evidence cases, once a plaintiff shows that the prohibited classification played a motivating part in the employment decision, the burden of both production and persuasion shifts to the employer to prove that it would have terminated the employee even if it had not been motivated by impermissible discrimination." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000); *see also Norbuta v. Loctite Corp.*, 1 F. App'x 305, 311–12 (6th Cir. 2001) ("If a plaintiff produces credible direct evidence of discrimination, discriminatory animus may be at least part of an employer's motive, and in the absence of [rebuttal evidence sufficient to remove any genuine issue (doubt) that the employer would have terminated the plaintiff even absent a discriminatory motive], there exists a genuine issue of material fact suitable for submission to the jury without further analysis by the court."); *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 382 (6th Cir. 2002) ("In contrast to purely circumstantial cases of retaliation, an employee who has presented direct evidence of improper motive does not bear the burden of disproving other possible nonretaliatory reasons for the adverse action. Rather, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive."). "In particular, the burden of persuasion stays with the plaintiff throughout the *McDonnell Douglas* analysis; in contrast, the defendant in a direct evidence case

25

has the burden to show that its stated reason for acting against the plaintiff was not pretextual." *Erwin*, 79 F. App'x at 899. In the summary judgment (as opposed to trial) context, the defendant-movant's burden is to remove all doubt about pretext, *i.e.*, remove any genuine issue of material fact as to whether it would have terminated the plaintiff even had it not been motivated (in part) by discriminatory animus.

2. *Plaintiffs' disparate pay claims*[26]

Plaintiffs do not indicate that they believe they have shown direct evidence of disparate pay,[27] and the Court is aware of no such evidence. Therefore, Plaintiffs must meet their burden of

---

[26] Since Plaintiffs bring their disparate pay claims on nearly identical factual circumstances, and all three disparate pay claims fail for the same reason, the Court will discuss all three claims simultaneously.

[27] Plaintiffs bring this claim pursuant to Title VII, Section 1981, and the THRA. These claims are often referred to as "discriminatory pay," "disparate pay," or more generally "disparate treatment" claims. Disparate pay claims are more commonly based on gender discrimination and are brought under both Title VII and the Equal Pay Act, rather than solely on the basis of race discrimination. When a claim is brought under either (or both) statutes on the basis of gender discrimination, it is subject to a standard different from the one applicable to Title VII claims generally:

> The legal analysis for disparate pay claims brought pursuant to the EPA, TEPA, or Title VII is essentially the same. *Disler v. Target Corp.*, 3:04–CV–191, 2005 WL 2127813, *23 n. 26 (E.D. Tenn. Aug. 31, 2005); *see also Odomes v. Nucare, Inc.*, 653 F.2d 246, 250 (6th Cir.1981). To establish a *prima facie* claim of unequal pay for equal work, a plaintiff has the burden to prove that the employer "pays different wages to employees of opposite sexes for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." *Vehar v. Cole Nat'l Group, Inc.*, 251 Fed. Appx. 993, 998 (6th Cir.2007) (quoting *EEOC v. Romeo Cmty. Schs.*, 976 F.2d 985, 987 (6th Cir.1992)). Once a plaintiff establishes a *prima facie* case of disparate pay, the burden shifts to the defendant to prove the wage differential is justified under one of four affirmative defenses: "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any other factor other than sex." *Buntin v. Breathitt Cnty. Bd. of Educ.*, 134 F.3d 796, 799 (6th Cir.1998). Since these are affirmative defenses, the defendant must demonstrate there is no genuine issue as to whether the difference in pay is due to a factor other than sex. *Id.* at 800. Consequently, if the defendant cannot satisfy this

26

showing that they have met their *prima facie* case under the *McDonnell Douglas* framework by indirect evidence. It is undisputed that Plaintiffs Jordan and Brown, who are African American individuals, are in a protected class. (Doc. No. 42 at ¶ 3). Plaintiff Condrey identifies as American Indian and Native American, is married to an African American woman, and advocates on behalf of and associates with African American individuals (namely, Plaintiffs Jordan and Brown). (*Id.* at ¶ 4; Doc. No. 45 at ¶ 1). Defendant does not seem to dispute that Plaintiff Condrey falls within a protected class.[28] Therefore, Plaintiffs have satisfied the first element of their disparate pay claim.

---

burden, the plaintiff is entitled to survive summary judgment even without setting forth evidence from which a jury could infer the employer's proffered reason for the wage differential is pretextual. *Id.* at 799; *see also Vehar,* 251 Fed. Appx. at 1002 ("We have previously held that a Title VII claim of wage discrimination is coextensive with a claim under the EPA insofar as the former incorporates the EPA's affirmative defenses.").

*Tolliver v. Children's Home-Chambliss Shelter*, 784 F. Supp. 2d 893, 903–04 (E.D. Tenn. 2011); *see also Korte v. Diemer*, 909 F.2d 954, 959 (6th Cir. 1990).

However, when a claim is brought on the basis of race (instead of gender) under Title VII, the Sixth Circuit has applied the general disparate treatment analysis discussed herein. *See e.g.*, *Conti v. Universal Enterprises, Inc.*, 50 F. App'x 690, 698 (6th Cir. 2002) (noting that the plaintiff, who failed to survive summary judgment on her Equal Pay Act claim, could still pursue her pay discrimination claim under Title VII, and stating the Title VII standard); *Richardson v. Wayne State Univ.*, 587 F. App'x 284, 286 (6th Cir. 2014) (discussing similarly situated requirement); *Frazier v. Phillip's Masonry Grp., Inc.*, No. 1:09-0022, 2010 WL 1882123, at *6 (M.D. Tenn. May 11, 2010) (stating the Title VII *prima facie* case for pay discrimination under Title VII and THRA); *Ware-Wilks v. Shelby Cty.*, No. 00-2143 GA M1, 2001 WL 36360521, at *4 (W.D. Tenn. Sept. 28, 2001) (noting *prima facie* case for pay discrimination under Title VII). As has been noted, the analysis is identical under Section 1981 and the THRA. *Norman v. Rolling Hills Hosp., LLC*, 820 F. Supp. 2d 814, 822 (M.D. Tenn. 2011) (conducting one analysis for a race discrimination claim based on the cutting of hours and wages under all three statutes); *see also Hughes v. Gen. Motors Corp.*, 212 F. App'x 497, 502 (6th Cir. 2007) (applying *McDonnell Douglas* framework to Section 1981 claim for disparate pay). When faced with both a discriminatory pay and discriminatory termination analysis, many courts conflate the two into one discussion. The Court here has separated the discussions due to the complexity of the facts and multiple Plaintiffs, but the Court has noted herein that the analysis and arguments overlap substantially.

[28] Even if Defendant did dispute that Plaintiff Condrey was in a protected class, the Court would find that he is in a protected class based on his advocacy for African American individuals and his

Defendant has not introduced evidence that Plaintiffs were not qualified for their jobs, so Defendant has not met its initial burden to show the absence of a genuine issue of material fact as to whether Plaintiffs can satisfy this element; put differently, Defendant does not seem to dispute that Plaintiffs have sufficient evidence to go the jury on this element. Instead, Defendant argues primarily that 1) Plaintiffs misunderstood Defendant's payment structure, such as how Internet leads[29] were distributed, and 2) Plaintiffs have not pointed to any similarly situated employees

---

association with African American individuals which involved him in a racially-charged situation at work. *See e.g.*, *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 513 (6th Cir. 2009) ("Individuals are also protected under Title VII from discrimination because of their advocacy on behalf of protected class members."); *Tetro v. Elliott Popham Pontiac, Oldsmobile, Buick, & GMC Trucks, Inc*., 173 F.3d 988, 994 (6th Cir. 1999) ("A white employee who is discharged because his child is biracial is discriminated against on the basis of his race, even though the root animus for the discrimination is a prejudice against the biracial child."); *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 574 (6th Cir. 2000) ("Simply put, this Court has now spoken that in order to state a cognizable claim under Title VII, the plaintiff himself need not be a member of a recognized protected class; he need only allege that he was discriminated on the basis of his association with a member of a recognized protected class."); *Winston v. Lear-Siegler, Inc.*, 558 F.2d 1266, 1268 (6th Cir. 1977) (finding that white employee could bring Section 1981 claim for discrimination when he was allegedly fired for protesting regarding the racially motivated firing of a non-white employee, and noting that "[w]hile the appellant was not fired because of his race, it was a racial situation in which he became involved that resulted in his discharge from his employment"); *Troy v. Suburban Mgmt. Corp.*, 908 F.2d 974 n.5 (6th Cir. 1990) ("While [Plaintiff] herself is not a member of a racial minority, her allegation that her tenancy was terminated on account of her association with a black man is sufficient to state a cause of action under Title VIII."); *Olsen v. Regent Dodge, Inc.*, No. CIV. 3:06-1219, 2007 WL 1866801, at *4 (M.D. Tenn. June 13, 2007), ("As a preliminary matter, defendant points out that the Sixth Circuit has held that, in limited circumstances, an employee who associates with a protected class is protected by Title VII. This is because even though the 'root animus' is against someone of a race other than the plaintiff, discrimination arising from relationships with another race makes the employee's own race the basis of the discrimination. As a result, even if plaintiff could not claim racial discrimination in his own right as a member of a protected class, he is potentially able to gain Title VII protections when the basis of his claim is harassment as a result of his relationship with members of a protected class." (internal citations omitted)), *report and recommendation adopted in part, overruled in part on other grounds*, No. 3:06-1219, 2007 WL 1866800 (M.D. Tenn. June 28, 2007).

[29] Plaintiff refers to three categories of Internet leads at issue: 1) ELEADS, 2) Internet leads, and 3) CRM leads. (Doc. No. 42 at ¶ 41). The parties are less than clear regarding the distinction between these three types of leads, and it appears that they were all some sort of computer or

outside the protected class who were treated more favorably than Plaintiffs with respect to pay.[30] (Doc. No. 37 at 13-15).

Defendant argues in its Memorandum that Plaintiffs have failed to present adequate comparators. The Courts find that Defendant has supported this assertion sufficiently to shift the burden to Plaintiffs to show that there are, in fact, similarly situated employees who were treated better than them. (Doc. No. 37 at 13-15). Defendant argues that Plaintiffs admit that Mr. Garner, an African American salesman, was given special treatment. (Doc. No. 37 at 14).[31] Defendant states: "This alone defeats Plaintiffs' disparate pay claims. [Plaintiffs] freely admit that Mathews Nissan gave special treatment to at least one other salesman in their protected class; they just take issue with the fact that it was not them." (*Id.*). However, Defendant cites the Court to no authority that indicates that a plaintiff's claims automatically fail as a matter of law merely because another person in the protected class is not subjected to the same disparately poor treatment the plaintiff allegedly received; to the contrary, as noted above, the relevant (fourth) element focuses on the

---

Internet-based lead. The Court therefore refers to all three types of leads generally as "Internet leads."

[30] Plaintiffs alternatively would satisfy element four if they were replaced by members outside their protected class. However, in its interrogatory answers, Defendant states that "No one was hired to specifically replace any of the Plaintiffs." (Doc. No. 36-7 at 15). Additionally, the Court notes that in opposing Plaintiffs' discriminatory-termination claim, Defendant argues that Plaintiffs Condrey and Jordan did not suffer an adverse employment action. The Court will discuss below as appropriate these arguments regarding the alleged nonexistence of an adverse action, but the Court need not (and does not) address them here, because 1) Defendant did not raise this argument in connection with this particular claim, and 2) Plaintiffs have failed to provide a similarly situated employee in any event.

[31] In addition to mentioning Mr. Garner when arguing that Plaintiffs have identified no proper comparators, Defendant mentions "white salesmen" and explains why they cannot be properly compared to Plaintiffs (in part relying on the disputes of fact discussed above regarding how internet leads are distributed). (Doc. No. 37 at 13-15).

29

treatment received by one or more persons *outside* the protected class. Defendant also argues that the Internet sales department is separate from the new and used sales departments in which Plaintiffs worked. (*Id.*). Therefore, according to Defendant, Plaintiffs were not eligible for the Internet leads, and Plaintiffs lack of access to CRM and the Internet sales leads should not be considered. (*Id.*). However, Plaintiffs have introduced evidence suggesting that Defendant has mischaracterized the applicable systems, thus creating a dispute of fact. As has been noted, on a motion for summary judgment the Court must construe all evidence in favor of the non-moving party.

But the Court does not find *material* the workings of Internet leads and the CRM system, so any dispute about it is not one of material fact. However such a dispute might be resolved, this claim fails anyway because Plaintiffs have not pointed the Court to a similarly situated individual outside the protected class who was treated better than they were with respect to pay.

"[T]he plaintiff must show that the 'comparables' are similarly situated *in all respects*." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992); *see also Hughes*, 212 F. App'x at 503 (finding *prima facie* case for disparate pay not be met when plaintiff did not show other employees were similarly situated); *Hatchett v. Health Care & Ret. Corp. of Am.*, 186 F. App'x 543, 548 (6th Cir. 2006) (same). "Thus, to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.*

In their response, Plaintiffs argue that:

> Terry Yarbrough continuously took customers away from Brown and gave them to Caucasian salespersons. (Brown Dep. 19). Brown complained to

Yarbrough about it and he responded, "It's my god damn dealership, I'll do whatever I want with them." (Brown Dep. 19; T. Yarbrough Dep. 48). Two Caucasian salesmen were known as the "house mice" because Defendant gave them "leads" to make sales. (Brown Dep. 85-88). Sales Manager Hall stated, "Those are my boys. We take care of them." (Brown Dep. 89). Brown never received a sales lead from Defendant. (Brown Dep. 91).

Additionally, Defendant gave its Caucasian salespersons computers, logins and passwords, and access to sales leads in its customer relationship management or CRM system. Plaintiffs requested log-in credentials and access to the system but were never provided them. (Jordan Dep. 106-08; Condrey Dep. 78-81, 83-84, 91; Brown Dep. 116-17). Further, Defendant directed and gave ELEADs, internet leads, and CRM leads to the Caucasian salespersons and not to Plaintiffs. Unlike their Caucasian counterparts, Plaintiffs were not placed in the CRM system and were not provided the tools and resources they needed to be successful. This resulted in the Caucasian salesmen being able to sell more vehicles and being paid more than Plaintiffs. Defendant's managers directed leads to the Caucasian salespersons but not to Plaintiffs. (Jordan Dep. 107-112, 115, 119-20; Condrey Dep. 78-81, 83-84, 91; Brown Dep. 116-17).

Plaintiffs reported the disparate treatment multiple times to sales managers March and Hall and were told that they would "get passwords," but never received them. (Jordan Dep. 128-29; Condrey Dep. 79, 96-97). Defendant understood that it was unlawful for it to direct sales leads to Caucasians but not to African-American salespersons. (T. Yarbrough Dep. 40-41).

(Doc. No. 41 at 5).[32]

In their testimony[33] they cite in their Response, Plaintiffs use various vague terms to describe the Caucasian employees that they claim were treated better than them: "one of the white guys, one of the salespeople," (Doc. No. 36-1 at 7), "all of the white guys," (*Id.*), "all the Caucasian ones that sit back there on the wall," (Doc. No. 36-2 at 29-30), "Caucasian, kind of heavyset, tall,"

---

[32] Plaintiffs seem to have abandoned their arguments regarding Plaintiff Brown being paid less for two sales than he earned and Plaintiffs losing customers to other salesmen. But even if Plaintiffs had persisted in these arguments, the Court would find that such disparate-pay claims fail for the same reasons discussed herein.

[33] Additionally, none of the cited portions of Mr. Yarbrough's testimony contain more specific information regarding white employees similarly situated to Plaintiffs who were treated differently (better).

31

(*Id.*), and "other people who started at the same time as me, of Caucasian decent, who didn't exactly associate themselves with African-Americans" (Doc. No. 36-3 at 22).

There are a few references that seem to pinpoint specific individuals more specifically, but these, too, are unavailing to Plaintiffs. When Plaintiff Brown discussed the two white "house mice" who were given leads he stated that "I don't know their names . . . There are two or three of them over there . . . I just don't know their name. I never associated with them. They're two white guys. They sat right there in the corner." (Doc. No. 36-1 at 23-24). The most specific reference pointed to by Plaintiffs is Plaintiff Condrey's testimony that "[s]ome guy named Mike,"[34] who was a Caucasian individual, got his log-in information sooner than Plaintiff Condrey, who started at the same time. (Doc. No. 36-3 at 22-23). However, Plaintiffs point the Court to no facts regarding what department Mike worked in (such as new or used cars), who his supervisor was, whether he had the same job title as Plaintiffs, or any way in which he was similar to Plaintiffs (other than starting at the same time as Plaintiff Condrey and being employed in sales in some respect).[35] Additionally, though Plaintiffs seem to make allegations that Mr. Garner was treated better than

---

[34] Plaintiff Condrey testified that he did not know Mike's last name. (Doc. No. 36-3 at 22-23).

[35] It is not the Court's job "to root through the record not unlike a pig in search of truffles to uncover any grain of evidence that might support the position of a party that chose to otherwise sit on its hands." *Penn-Daniels, LLC v. Daniels*, No. 07-1282, 2010 WL 431888, at *3 (C.D. Ill. Jan. 28, 2010) (citing *Casna v. City of Loves Park*, 574 F.3d 420, 424 (7th Cir. 2009)); *see also Emerson v. Norvartis Pharm. Corp.*, 446 F. App'x 733, 736 (6th Cir. 2011) (noting that "judges are not like pigs, hunting for truffles" that might be buried in the record). Moreover, the Federal Rules of Civil Procedure are clear that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by citing to particular parts of materials in the record[.]" Fed. R. Civ. P. 56(c)(1).

they were,[36] Mr. Garner was in the same protected class as Plaintiffs, and so he cannot be used as a similarly situated employee—a comparator—for purposes of a disparate pay claim.

Plaintiffs do not point the Court to any other similarly situated employees, instead making only the above-referenced vague references to white employees generally being treated better. As noted, Plaintiffs do not attempt to advance an argument that the circumstances of such white employees' employment make them similarly situated to Plaintiffs. Courts regularly dismiss claims when a plaintiff fails to point to another employee that was similarly situated, and the Court finds that summary judgment is appropriate here based on such failure by Plaintiffs. *E.g.*, *Bullion v. Ford Motor Co.*, 60 F. Supp. 2d 765, 771 (M.D. Tenn. 1999) ("Plaintiff, on the other hand, has come forward with nothing other than her bald allegations to support her contention that comparable male employees were treated more favorably than she was. Plaintiff has not named any comparable male employee who was favored over her."); *Pruitt v. CHSPSC, LLC*, No. 3:17-CV-01048, 2018 WL 4300182, at *11 (M.D. Tenn. Sept. 10, 2018) (dismissing claim for disparate pay when the plaintiff produced no similarly situated employees).

For the reasons discussed, the Court will grant summary judgment to Defendant on Plaintiffs' disparate pay and treatment claims.

B. <u>Discriminatory Termination</u>

Plaintiffs claim that they have presented direct evidence of discriminatory termination and that therefore the burden-shifting analysis under *McDonnell Douglas* is inappropriate. (Doc. No.

---

[36] As noted above, Defendant likewise relies on the relatively favorable treatment of Mr. Garner, an African American individual. Defendant's reliance seems more sensical than Plaintiffs' reliance since, after all, Defendant's position generally is that they treat African American employees perfectly well; the Court is not sure what Plaintiffs have to gain by noting favorable treatment of any African American employees. But in any event, as noted above, any comparison (by either side) of Plaintiffs with Mr. Garner is of no analytical value under the law.

33

41 at 21-23). Plaintiffs claim that evidence of the use of racially derogatory words by Defendant's employees is direct evidence sufficient to raise a genuine dispute on the material issue of whether their terminations were racially motivated. (*Id.*). Defendant does not provide argument to counter Plaintiffs' claim that there is direct evidence of racial discrimination present in this case, and instead Defendant focuses its arguments entirely on the *McDonnell Douglas* indirect-evidence framework, which is inapplicable to the extent Plaintiffs have presented direct evidence. (Doc. No. 37).[37] Alternatively to having shown direct evidence of discrimination, Plaintiffs argue, they have shown their *prima facie* case using indirect evidence under *McDonnell Douglas*. (*Id.* at 23).

_____

[37] In its Memorandum, Defendant states correctly that "[a] Title VII claim can be proven either by direct proof of discrimination or by indirect evidence under the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." (Doc. No. 37 at 13). But Defendant fails to address in its Memorandum (except in one place in reference to the disparate pay claim) Plaintiffs' option to offer direct evidence of their claims. It might seem questionable, therefore, whether Defendant succeeded in shifting the burden to Plaintiffs to show that direct evidence is present in this case. However, Defendant has raised (albeit with an exclusive focus on the *McDonnell Douglas* version of a *prima* facie case) Plaintiff's alleged inability to show a *prima facie* case, and one way that Plaintiffs may establish a *prima facie* case is through presenting the Court with direct evidence. *See e.g.*, *Thompson v. Hendrickson USA, LLC*, No. 3:20-CV-00482, 2021 WL 848694, at *19 n.20 (M.D. Tenn. Mar. 5, 2021) ("Plaintiff might meet her *prima facie* case in various ways, including via direct evidence[.]") (Richardson, J.); *Conti v. Am. Axle & Mfg., Inc.*, 326 F. App'x 900, 911 (6th Cir. 2009) ("As in the direct evidence context, a plaintiff relying on indirect evidence still must make a *prima facie* showing of discrimination."). *Laderach v. U-Haul of Nw. Ohio*, 207 F.3d 825, 830 (6th Cir. 2000) ("[D]irect evidence of discrimination merely suffices to establish a *prima facie* case, which shifts the burden of production to the employer to come forward with a non-pretextual reason for its decision[.]") (Norris, J., concurring). In other words, a *prima facie* case can be established either by presenting direct evidence or by establishing each of the elements of an indirect *prima facie* case under *McDonnell Douglas*. The upshot is that a plaintiff (at either the summary-judgment or trial stage) has the option of shifting a burden to the defendant by showing (to the standard required at the applicable stage) direct evidence, indirect evidence, or both kinds of evidence. *See e.g.*, *Weigel v. Baptist Hosp. of E. Tennessee*, 302 F.3d 367, 381–82 (6th Cir. 2002) ("It is well settled that if a plaintiff presents direct evidence of discrimination, she need not proceed under the *McDonnell Douglas* formula." (citation omitted)); *Hicks v. United States Off. of Pers. Mgmt.*, No. 2:05CV100, 2006 WL 8441765, at *2 (S.D. Ohio June 20, 2006) ("In a case alleging employment discrimination in violation of Title VII, a plaintiff can withstand a motion for summary judgment either by presenting direct evidence of discrimination or circumstantial evidence from which a jury may infer a discriminatory motive.");

34

1. *Plaintiff Brown*[38]

It is undisputed that Plaintiff Brown is a member of a protected class and that he was subject to an adverse employment action. (Doc. No. 37 at 16). Arguing solely in the context of the *McDonnell Douglas* framework, and apparently assuming arguendo that Plaintiff Brown can establish his *prima facie* case thereunder, Defendant claims that Plaintiff Brown's discriminatory termination claim fails because (according to Defendant) there was a legitimate and nondiscriminatory reason for his termination and Plaintiff Brown cannot show that the decision to terminate him was a mere pretext for discrimination. (*Id.* at 16). Defendant argues that since Plaintiff Brown was fired after he got into a verbal altercation, and admitted in his deposition that an employee going on a "tirade" should be fired, there was a legitimate reason for his firing. (*Id.* at 17). Plaintiffs argue that Plaintiff Brown has shown direct evidence of discrimination, and that therefore the *McDonnell Douglas* burden shifting approach is inappropriate in analyzing his claims. (Doc. No. 41 at 21-23). Plaintiffs also argue that in light of Defendant's shifting

---

*Diaz v. City of Inkster*, No. CIVA05-CV-70423-DT, 2006 WL 2192929, at *9 (E.D. Mich. Aug. 2, 2006) ("Plaintiff's presentation of direct evidence means that the burden-shifting paradigm (for indirect evidence) does not apply.").

The quote from *Diaz* calls to mind an important distinction. If the plaintiff presents direct evidence, then (as *Diaz* states) the burden-shifting paradigm *for indirect evidence* does not apply, but a different kind of burden-shifting does apply. Specifically, "[w]hen a plaintiff establishes discrimination through direct evidence, the burden shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision absent the impermissible motive." *Blair*, 505 F.3d at 523. This one-step, uni-directional burden-shifting is not the potentially two-step and bi-directional burden-shifting prescribed by *McDonnell Douglas*, but it is a kind of burden-shifting nonetheless.

[38] The Court notes that, though an individual analysis for each Plaintiffs' claim is needed, Plaintiffs in their briefing have conflated their respective factual arguments. The Court will attempt to parse which arguments correspond with which Plaintiff.

justifications for the termination, there is a genuine dispute of (material) fact as to why Plaintiff Brown was fired. (*Id.* at 24).

Defendant focuses its argument on whether there was a legitimate, non-discriminatory reason for terminating Plaintiff Brown, not on the antecedent question of whether there is an absence of evidence to support Plaintiff's *prima facie* case under *McDonnell Douglas*. Defendant does not appear to concede that there was an individual similarly situated to Plaintiff Brown, inasmuch as it lists only the other three elements (of an indirect-evidence *prima facie* case) as undisputed: "Mathews Nissan does not dispute that [Plaintiff] Brown was a member of a protected class, that he engaged in protected activity which Mathews Nissan knew about, or that he was subjected to an adverse employment action." (Doc. No. 37 at 16). However, Defendant makes no argument regarding the "similarly situated" element of the *prima facie* case—and does not point to evidence suggesting the absence of this element—and Defendant has therefore failed to shift the burden to Plaintiff Brown on the indirect evidence framework. That is to say, the burden never fell to Plaintiff Brown to show that there was a genuine issue of material fact as to the existence of all of the elements of his *prima facie* case on an indirect-evidence theory.

Despite not showing the absence of an element in Plaintiff Brown's *prima facie* case, if Defendant can show (with evidence) a legitimate, nondiscriminatory reason for Plaintiff Brown's termination, then the burden would revert back to Plaintiff to show that this legitimate, nondiscriminatory reason was pretext. *Blair*, 505 F.3d at 524 ("The defendant must then offer admissible evidence of a legitimate, nondiscriminatory reason for its action. If the defendant does so, the plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful discrimination. Although the burdens of production shift, '[t]he ultimate burden of persuading the trier of fact that the defendant

36

intentionally discriminated against the plaintiff remains at all times with the plaintiff.'" (internal citation omitted)).

Defendant has met its burden of production in regards to a legitimate, nondiscriminatory reason for terminating Plaintiff Brown, by producing evidence that Plaintiff Brown went on a tirade at the dealership and that this tirade was actually the reason Defendant fired Plaintiff Brown. Therefore, the burden shifts to Plaintiff Brown to show pretext.

Plaintiff Brown's argument in response is that Defendant's shifting justifications are evidence of pretext that preclude summary judgment. (Doc. No. 41 at 24). As has previously been noted, a plaintiff "always bears the burden of producing 'sufficient evidence from which the jury could reasonably reject [the defendants'] explanation and infer that the defendants intentionally discriminated against him.'" *Clark*, 424 F. App'x at 474. This is a burden of persuasion, which "merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

The Court finds that Plaintiff Brown has carried his burden here for the same reasons that will be discussed below in connection with his direct discrimination claim, namely, that Defendant has provided shifting justifications for Plaintiff Brown's termination. Therefore, the Court finds that Plaintiff Brown has produced sufficient evidence from which a jury could reasonably reject Defendant's reason for firing him. As a result, the Court finds that Plaintiff Brown has sufficiently met his burden as to pretext. Therefore, Plaintiff Brown's claim of discriminatory termination survives to the extent based on a theory of indirect evidence.

The Court next turns to analyzing Plaintiff Brown's direct-evidence theory.[39] "Racial slurs or statements that suggest that the decision-maker relied on impermissible stereotypes to assess an employee's ability to perform can constitute direct evidence." *Erwin*, 79 F. App'x at 897; *see also Cushman-Lagerstrom v. Citizens Ins. Co. of Am.*, 72 F. App'x 322, 331 (6th Cir. 2003) (noting that "a variety of statements referring to the employee's protected status" would constitute direct evidence if they "require the conclusion that unlawful discrimination was at least a motivating factor" (citation omitted)); *Wexler v. White's Furniture, Inc.*, 317 F.3d 564, 572 (6th Cir. 2003) (evidence of repeated age-based comments showed a material dispute of fact regarding whether "stereotypical beliefs about the capabilities of older managers that influenced [the defendant's] decision to demote" the plaintiff) (discussed in *Cushman-Lagerstrom*). A decisionmaker is one who "exercised supervisory authority, imposed discipline, and influenced hiring and firing at the company . . . The management determination is not confined to labels but rather must be assessed in light of functions." *E.E.O.C. v. Ralph Jones Sheet Metal, Inc.*, 777 F. Supp. 2d 1119, 1124 (W.D. Tenn. 2011).

"The context in which the comments are made is also critical. Discriminatory remarks made while implementing an adverse employment action are likely to reveal animus." *Erwin*, 79 F. App'x at 898. However, "isolated and ambiguous comments" are not enough, especially when they are made prior to a decision to terminate. *Id.* at 897 (quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1025 (6th Cir. 1993)); *see also Nasrallah v. Robert Half Int'l, Inc.*, No. 1:19-CV-00795,

---

[39] The Court will discuss the direct discrimination framework because Defendant could be successful with respect to a claim of direct evidence in particular, and the Court could issue a Fed. R. Civ. P. 56(g) order clarifying and pronouncing that Plaintiff Brown cannot proceed at trial on a direct evidence theory. However, as the Court will discuss, the Court does not find that to be the case in this instance, as Plaintiff Brown has shown sufficient evidence of direct discrimination to survive summary judgment.

38

2020 WL 1862657, at **5-8 (N.D. Ohio Apr. 14, 2020). Thus, courts often look for a "temporal proximity between the discriminatory act and the termination." *DiCarlo v. Potter*, 358 F.3d 408, 417 (6th Cir. 2004) (reversing summary judgment when plaintiff claimed that supervisor had called him a "dirty wop," a reference to his Italian-American heritage, three weeks before his termination), *overruled on other grounds*, *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Additionally, "[w]hether words or conduct were unwelcome generally present questions of fact as they turn on witness credibility." *Ralph Jones Sheet Metal, Inc.*, 777 F. Supp. 2d at 1123.

The record reflects evidence of several instances of derogatory comments made by Defendant's employees, which Plaintiffs argue show the presence of direct evidence of discrimination in this case. Specifically, Plaintiffs claim that:[40]

---

[40] These comments are often testified to by one or two Plaintiffs. Though disputing that the statements are accurate, Defendant does not dispute Plaintiffs' competency and basis of knowledge to testify as they have. Some district courts have indicated that the presentation of only self-serving statements by a plaintiff is insufficient to survive summary judgment. *E.g.*, *Gooden v. Ryan's Rest. Grp., Inc.*, No. 5:04CV179R, 2007 WL 855326, at *7 n.5 (W.D. Ky. Mar. 14, 2007) (noting, but not basing its ruling on, case law in other circuits that a plaintiff in a Title VII case cannot solely rely on self-serving testimony, and stating "[u]nder summary judgment, the Court merely decides, as a matter of law, whether a jury could reasonably conclude that the evidence presented is credible"); *Young v. United Parcel Serv., Inc.*, 992 F. Supp. 2d 817, 830 (M.D. Tenn. 2014) ("As an initial matter, [Plaintiff's] self-serving testimony is the only evidence that Simmons made such a statement. Such self-serving and conclusory allegations are insufficient to overcome a motion for summary judgment."); *Morris v. Mary Rutan Hosp.*, No. 2:18-CV-543, 2020 WL 5943022, at *7 (S.D. Ohio Oct. 7, 2020) ("Plaintiff's self-serving testimony is the only evidence he offers to suggest that he was unfairly treated because of his age; he offers no statements from others that suggest that his age was a factor in the decision to impose additional requirements on him. Such self-serving and conclusory allegations are insufficient to overcome a motion for summary judgment.").

Despite this line of cases, the Sixth Circuit recently stated:

That evidence, we note, consists wholly of self-serving statements. Sometimes, evidence of that nature might not be sufficient to survive summary judgment. For instance, where self-serving testimony is blatantly and demonstrably false, it understandably may not create a genuine issue of material fact, thereby allowing a court to grant summary judgment. *See, e.g.*, *Scott v. Harris*, 550 U.S. 372, 380, 127

39

S. Ct. 1769, 167 L.Ed.2d 686 (2007) (holding that a court, when determining whether there is a genuine dispute of material fact in a case, may ignore testimonial evidence when it is "blatantly contradicted" by video evidence); *see also CenTra, Inc. v. Estrin*, 538 F.3d 402, 419 (6th Cir. 2008) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1480 (6th Cir. 1989) (assuming as true on summary judgment the nonmoving party's version of events unless that version is "totally implausible")). But nothing in the record leads us to the conclusion that Davis's claim that Gallagher planted the drugs is demonstrably false or totally implausible. Although perhaps not as strong as some other evidence might be, self-serving statements can create a genuine dispute of material fact to be resolved at trial. That appears to be the case here.

*Davis v. Gallagher*, 951 F.3d 743, 750 (6th Cir. 2020); *see also Robinson v. Brege*, No. 1:20-CV-449, 2021 WL 1092638, at *2 (W.D. Mich. Mar. 5, 2021), *report and recommendation adopted*, No. 1:20-CV-449, 2021 WL 1091551 (W.D. Mich. Mar. 22, 2021) (rejecting argument that plaintiff's evidence should not be considered and noting that "labeling a party's testimony self-serving, absent, for example, prior contradictory deposition testimony, is an argument without traction, as testimony by a party is inherently self-serving" (relying on *Davis*)); *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 455 (6th Cir. 2004) (considering plaintiff's testimony, which was the only evidence, regarding the use of the "n-word").

Defendant has also not argued that Plaintiffs' testimony is not credible. This Court has previously found in a similar factual context that "[Defendant] maintains that [Plaintiff] has presented 'no evidence' other than 'self-serving testimony' to support his pretext argument. The court disagrees, particularly where the same could be said of the defendants' evidence, which largely consists of self-serving testimony by the supervisors whom [Plaintiff] now accuses of misconduct. [The Court will view] the facts in the light most favorable to [Plaintiff] and resolving factual disputes in his favor[.]" *Foreman v. Five Star Food Serv., Inc.*, 950 F. Supp. 2d 958, 976 (M.D. Tenn. 2013), *order vacated in part on other grounds on reconsideration*, No. 3:11-CV-01124, 2013 WL 5675899 (M.D. Tenn. Oct. 18, 2013) (vacating part of previous ruling upon presentation of new evidence by movant); *see also Pendleton*, 2016 WL 2927983, at *10 (rejecting Defendant's argument that plaintiff's unsubstantiated statement should not be considered on summary judgment) (discussing *Johnson*). The Court additionally notes that this case has proceeded in a somewhat atypical fashion in that three Plaintiffs have brought their claims together in a single lawsuit, instead of individually. Though joined together as co-plaintiffs, they each bear the burden of proving their own respective claims, and therefore a particular Plaintiff's testimony regarding treatment the other Plaintiffs faced is therefore not necessarily supportive of that Plaintiff's own claims; thus, such testimony is not necessarily self-serving in the way that caused other courts to question the credibility of a plaintiff's testimony in support of his or her own claims. The Court therefore will consider these statements under the appropriate summary judgment standard.

That is to say, "[on motion for] summary judgment, the Court merely decides, as a matter of law, whether a jury could reasonably conclude that the evidence presented is credible." *Gooden*, 2007 WL 855326, at *7. In so doing, the Court keeps in mind that even unsupported and self-serving statements can be credible under certain circumstances, although "[t]he Court views self-serving testimony opposing a motion for summary judgment with scrutiny when it is unsupported

- According to Plaintiff Jordan's and Plaintiff Brown's deposition testimony, Mr. Yarbrough said to Plaintiff Brown "nigga, boy, I don't give a shit what you niggas do," "y'all boys need to separate," and threatened to fire him during Plaintiff Brown's altercation with Mr. Garner. Plaintiff Jordan witnessed this incident. (Doc. No. 42 at ¶ 16; Doc. No. 45 at ¶¶ 10, 12, 14). Mr. Yarbrough disputes that he used racist language.

- According to Plaintiff Condrey's deposition testimony, Plaintiff Condrey overheard Mr. Yarbrough refer to an African American as the "n-word" when speaking to a Caucasian salesman. (Doc. No. 45 at ¶ 18). Mr. Yarbrough disputes that he used racist language.

- According to Plaintiff Condrey's deposition testimony, Plaintiffs Jordan and Brown had told Plaintiff Condrey they also heard Mr. Yarbrough using the n-word. (*Id.* at ¶ 19).[41] As noted, Mr. Yarbrough disputes that he used racist language.

- According to Plaintiff Brown's deposition testimony, Caucasian employees referred to Mr. Garner as "the field nigga." (*Id.* at ¶ 20). This does not appear to be disputed.[42]

- According to the deposition testimony of each Plaintiff, each Plaintiff heard Mr. Hall use "my nigger" and "that's my nigga" frequently in the workplace. (*Id.* at ¶ 21). This does not appear to be disputed.

- According to Plaintiff Condrey's deposition testimony, a Caucasian salesman used the terms "Squanto" and "Chief" to refer to Plaintiff Condrey. (*Id.* at ¶ 26). This does not appear to be disputed.

- According to Plaintiff Jordan's deposition testimony, he heard Mr. Yarbrough call Plaintiff Brown "boy" several times during the events surrounding Plaintiff Brown's firing. (*Id.* at ¶ 54). According to Plaintiff Jordan's and Plaintiff Brown's deposition testimony, Mr. Yarbrough also said, "You need to get your black ass off my damn dealership, boy." (*Id.* at ¶ 57). According to Plaintiff Brown's deposition testimony, When Plaintiff Brown asked what Mr. Yarbrough had said, Mr.

---

by additional evidence." *Johnson v. Buddy's Bar-B-Q, Inc.*, No. 1:13-CV-254, 2015 WL 1954454, at *5 (E.D. Tenn. Apr. 29, 2015).

[41] These references to the "n-word" in Plaintiff's deposition testimony seem to indicate that the deponents heard Mr. Yarbrough use the full word, but that the deponents themselves (very understandably) chose not to use the full word in describing Mr. Yarbrough's conduct.

[42] Plaintiff Brown's reference was to Caucasian employees generally; it is unclear which (and how many) Caucasian employees he had in mind.

Yarbrough responded "You heard me, nigga. You're fired." (*Id.*).[43] As noted, Mr. Yarbrough disputes that he used racist language.

---

[43] One might wonder whether an issue of hearsay is implicated here. That is, at first glance, conceivably the testimony of the referenced deponents (Plaintiffs) includes hearsay in that it refers to the prior alleged statements of other persons. Hearsay evidence is an out-of-court statement (except of the kind described in Rule 801(d)) offered to prove the truth of the matter asserted in the statement. Fed. R. Evid. 801(c). And under the so-called "hearsay rule," hearsay generally is inadmissible at trial. Fed. R. Evid. 802. Likewise, generally, "hearsay evidence cannot be considered on a motion for summary judgment." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994).

With respect to the out-of-court statements mentioned here, neither party has raised the issue of hearsay in their undisputed statements of fact or in briefing. Defendant raises the issue of hearsay only twice, both in reference to comments allegedly made by Mr. Floyd, which the Court has already disregarded (*supra* footnote 1). (Doc. No. 45 at ¶¶ 22, 23). However, "[i]f a party fails to object before the district court to the affidavits or evidentiary materials submitted by the other party in support of its position on summary judgment, any objections to the district court's consideration of such materials are deemed to have been waived . . ." *Wiley v. United States*, 20 F.3d 222, 226 (6th Cir. 1994); s*ee e.g.*, *Moore v. City of Memphis*, 175 F. Supp. 3d 915, 929 (W.D. Tenn. 2016), *aff'd*, 853 F.3d 866 (6th Cir. 2017) (finding hearsay objection waived when no argument was provided); *Brady v. City of Westland*, 1 F. Supp. 3d 729, 732 n.3 (E.D. Mich. 2014) ("Indeed, Plaintiff not only failed to raise any hearsay concerns or other evidentiary objections with respect to the police reports, but she explicitly relied on the reports of the Westland officers as the basis for her counter-statement of facts in her responses to Defendants' motions. Accordingly, Plaintiff is in no position to complain about the Court's consideration of the police reports . . ."); *Fish Farms P'ship v. Winston-Weaver Co. Inc.*, No. 2:09-CV-163, 2012 WL 5877967, at *4 (E.D. Tenn. Nov. 20, 2012), *aff'd*, 531 F. App'x 711 (6th Cir. 2013) ("It is again noted that plaintiff has made no effort to address the hearsay issue, and the issue is deemed waived.").

Though the Court finds the hearsay issue to have been waived, the Court briefly notes that in any event it would not have found the statements inadmissible under the hearsay rule, for two reasons. First, these statements are offered not for the truth of the matter asserted in the statement, but rather to show merely that the statements (which include a particularly derogatory term) were made. *Blair*, 505 F.3d at 524 ("[Plaintiff] offers [the supervisor's] April 2001 statement for that fact that it was said, not to prove that [Plaintiff] was actually too old to work the Ford account. Accordingly, this statement is not hearsay because it is not being offered for the truth of the matter asserted."). Second, the statements made by supervisors (which, as discussed, generally are relevant when determining the existence *vel non* of direct evidence of discrimination because they are supervisors' statements) would fall under the opposing-party-statement exception, which provides that a statement is not hearsay when it "was made by the party's agent or employee on a matter within the scope of that relationship and while it existed." Fed. R. Evid. 801(d)(2)(D). *See e.g.*, *Carter v. Univ. of Toledo*, 349 F.3d 269, 275 (6th Cir. 2003) ("Being a direct decision-maker, of course, constitutes strong proof that a statement was made within the scope of employment, but the 'scope of employment' criterion extends beyond direct decision-makers."); *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 456 (6th Cir. 2004) ("The statement was admissible under the hearsay exception for an admission by a party-opponent.").

42

As previously noted, "direct evidence is evidence which, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor.'" *Bartlik*, 73 F.3d at 103 n.5. The Court finds that several of these comments are not direct evidence of discrimination against Plaintiff Brown. For example, the comments by various employees who did not have the power to fire Plaintiff Brown, such as the Caucasian employees using the term "field nigga," do not meet the above-referenced criteria for direct evidence of discrimination, because they were not made by a supervisor in temporal proximity with Plaintiff Brown's firing. *E.E.O.C. v. Ralph Jones Sheet Metal, Inc.*, 777 F. Supp. 2d at 1124. In this regard, the Court notes that it is one thing for a comment to be racist and offensive, and another for it to be direct evidence of discriminatory motive for a particular adverse employment action.

However, the Court finds that some of these statements constitute direct evidence of discrimination against Plaintiff Brown. In a similar case in this Court, there was evidence that an individual defendant told frequent jokes using the "n-word" and fired an African American plaintiff by stating "[g]et your black ass out of here, you're fired," which the Court found to be direct evidence establishing a nexus between the adverse employment action and the discriminatory conduct. *Pendleton*, 2016 WL 2927983, at *5; *see also Fite v. Comtide Nashville, LLC*, 686 F. Supp. 2d 735, 751 (M.D. Tenn. 2010) (finding direct evidence of discrimination when there was "close temporal proximity" between racist comments and the termination of plaintiffs). The Court likewise here concludes that testimony of Mr. Yarbrough's use of particular terms ("black ass," "boy," and "nigga") constitutes direct evidence that race played a part in Plaintiff Brown's firing. Though it is disputed what language was used during Plaintiff Brown's firing, the Court must resolve all factual disputes in favor of Plaintiffs at the summary judgment stage, and Defendant's attempts to argue the weight or credibility of the evidence are unavailing at this stage.

Plaintiffs have presented evidence that Mr. Yarbrough, the General Manager who had the authority to fire Plaintiff Brown (and did in fact do so), used the language "boy," "black ass," and a variant of the "n-word" while firing Plaintiff Brown. Additionally, the Court notes that evidence shows that use of this language on that occasion was not an isolated incident; Plaintiffs presented evidence that Mr. Yarbrough had previously threatened to fire Plaintiff Brown while calling him "boy" and a variant of the "n-word." This is sufficient to constitute direct evidence of discrimination against Plaintiff Brown on the basis of race.

Due to the presence of direct evidence, the burden shifts to Defendant to show that it would have fired Plaintiff Brown even if race had played no part in the decision.[44] *Nguyen*, 229 F.3d at 563; *Erwin*, 79 F. App'x at 899. Defendant proposes that it fired Plaintiff Brown for insubordination because Plaintiff Brown went on a "tirade" at the dealership, and that it would have fired Plaintiff Brown for this reason regardless of his race. (Doc. No. 37 at 17). Notably, in his deposition Plaintiff Brown admitted that he went on a "tirade" and, when asked whether an employee going on a tirade at a dealership should be terminated, responded "[a]bsolutely." (Doc. No. 36-1 at 16). In arguing that Plaintiff Brown's tirade was not a legitimate reason for his firing, Plaintiffs claim that Defendant has changed its reasons for firing Plaintiff Brown—which according to Plaintiffs, should be taken as evidence of a genuine dispute of material fact as to the reason that Plaintiff Brown was terminated. (Doc. No. 41 at 23-24).

The Sixth Circuit has found that "[a]n employer's changing rationale for making an adverse employment decision can be evidence of pretext. Shifting justifications over time calls the credibility of those justifications into question. By showing that the defendants' justification for

---

[44] In notable contrast, if the "pretext" stage of the inquiry is reached under the *McDonnell Douglas* framework, then the burden (to show lack of pretext) falls upon the plaintiff, as discussed above.

firing him changed over time, [a plaintiff] shows a genuine issue of fact that the defendants' proffered reason was not only false, but that the falsity was a pretext for discrimination." *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 592 (6th Cir. 2002) (quotation marks and internal citations omitted); *see also Pierson v. Quad/Graphics Printing Corp.*, 749 F.3d 530, 541 (6th Cir. 2014) ("Although it is possible . . . that both reasons played a role in [Plaintiff's] discharge, a reasonable jury could conclude that [Plaintiff] shifted the reasons for his decision over time. Such shifting justifications raise an inference that the proffered reasons are false and are pretext for discrimination."); *Tinker v. Sears, Roebuck & Co.*, 127 F.3d 519, 523 (6th Cir. 1997) ("The inconsistency of these statements by the different managers considering the . . . incident, and [Plaintiff's] role in that incident, creates two important questions of material fact: who was actually responsible for the decision to fire [Plaintiff], and what was the reason that caused that decision maker to decide that [Plaintiff] should be fired? These inconsistencies demonstrate that there is a genuine issue of material fact regarding [Defendant's] proffered reason for [Plaintiff's] termination.").

Plaintiffs argue that Defendant originally claimed that Plaintiff Brown was fired for his conduct in connection with both the July 3, 2018 incident (his altercation with Mr. Garner on his first day of work) *and* the July 17, 2018 incident (the day Plaintiff Brown's employment was terminated). (Doc. No. 41 at 24). Then, later in litigation, Defendant claimed that it fired Plaintiff Brown *only* for the July 17, 2018 incident and that Plaintiff Brown had in fact done nothing wrong on July 3, 2018. (*Id.*). Defendant argues that it has not offered shifting justifications but rather has always maintained that Plaintiff Brown "was terminated after the July 17, 2018 incident[.]" (Doc. No. 44 at 3). Defendant muddies the waters with this statement. Defendant is responding to Plaintiffs' arguments that Defendant has changed *why* it fired Plaintiff Brown with a statement

expressly addressing only *when* it fired Plaintiff Brown (which is not in dispute).[45] Defendant here provides no real response as to *why* it fired Plaintiff Brown and whether that reason has changed. Regardless of Defendant's misdirected express focus on when it fired Plaintiff Brown, Defendant implies that Plaintiff Brown was fired for the July 17 incident (and not the earlier incident) by recounting in detail only the events that occurred on July 17 and stating that these events justified its decision to terminate Plaintiff Brown. In contrast, Defendant never mentions the July 3 incident in its Reply.

In Defendant's interrogatory answers, Defendant states "Plaintiff Chris Brown's employment was terminated by Terry Yarbrough on July 17, 2018, due to his actions in the incidents on July 3, 2018 *and* July 17, 2018." (Doc. No. 36-7 at 15 (emphasis added)). During his deposition, Mr. Yarbrough changed his answer multiple times regarding why Plaintiff Brown was fired. Mr. Yarbrough was first asked whether Plaintiff Brown was terminated due to his actions during the incidents on July 3, 2018 and July 17, 2018, to which he responded affirmatively. (Doc. No. 36-4 at 16). When asked whether Plaintiff Brown had done anything wrong during the July 3, 2018 incident with Mr. Garner, Mr. Yarbrough initially responded that verbally arguing with another salesman was wrong, but he then changed his answer to indicate that Plaintiff Brown had done nothing wrong and was not reprimanded for the July 3, 2018 incident. (*Id.*). After this exchange, when asked again why Plaintiff Brown was fired, Mr. Yarbrough responded that "[h]e

---

[45] There is obviously a difference between stating *when* someone was fired and *why* they were fired. Defendant conceivably could have intended its statement to blur the distinction. Why might Defendant do so? Because the truth of Defendant's statement is undeniable—Plaintiff Brown *was* terminated after July 18—thus enabling Defendant to claim candor to the Court while at the same time perhaps getting the Court to construe the statement to mean that Defendant has always maintained that Plaintiff Brown was fired only because of the July 17 incident, which is untrue. The Court does not accuse Defendant of pulling such a stunt, however; instead, it merely notes that Defendant's statement cannot be taken as a claim that Defendant has always claimed that Defendant was fired only because of the July 17 incident.

46

was terminated on July 17th for the incident then." (*Id.*). Counsel then followed up by asking Mr. Yarbrough again whether he also considered the July 3, 2018, incident as part of his decision to terminate. (*Id.*). Mr. Yarbrough responded that that was correct (as in, he had in fact considered the incidents on both dates, including the one when Plaintiff Brown did nothing wrong, when terminating Plaintiff Brown). (*Id.*). Despite this exchange and its answer to the interrogatories, Defendant focuses its Reply on Plaintiff's actions on July 17.

The Court finds that the record indeed reflects a shifting justification for Plaintiff Brown's firing by Defendant. This is devastating to Defendant's ability to obtain summary judgment here. Unlike under the *McDonnell Douglas* burden-shifting framework, in a direct evidence case Defendant carries the burden of showing that its proffered reason for firing Plaintiff Brown was not pretextual. *Erwin*, 79 F. App'x at 899. In order to carry its burden, Defendant needs to show that a reasonable jury would have to find that it would have fired Plaintiff Brown regardless of his race, which has not been shown here. *See Maybury v. Slaton*, No. 3:06CV363, 2010 WL 518041, at *8 (S.D. Ohio Feb. 2, 2010) ("[I]f the moving party also bears the burden of persuasion at trial, the moving party's initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." (quotation marks and citation omitted)). Defendant certainly has not explained or shown with evidence why (and based on which events) it fired Plaintiff Brown in such a way as to remove all doubt that it would have fired him irrespective of the racial motivations a jury could find motivated (at least in part) Plaintiff Brown's firing. Thus, Defendant has not carried its burden of persuasion as necessary to obtain summary judgment.

Therefore, the Court finds that Plaintiff Brown avoids summary judgment on a direct-evidence theory.

2. *Plaintiff Condrey*

Defendant argues that Plaintiff Condrey was not subject to an adverse employment action. (Doc. No. 37 at 18). In so doing, Defendant cites Plaintiff Condrey's deposition testimony to the effect that he was never told he was fired and instead announced on July 20 that he was resigning. This is sufficient to shift the burden to Plaintiff Condrey on both his indirect evidence and direct evidence claims, as an adverse employment action is a requirement of each.[46] Plaintiff Condrey responds that he was subject to a constructive discharge, which is a type of adverse employment action, and that he has presented direct evidence of discrimination. (Doc. No. 41 at 25). The Court will first address whether Plaintiff Condrey suffered an adverse employment action (in the form of a constructive discharge) before analyzing the direct evidence he points to as evidence of discrimination.

To show a constructive discharge, a plaintiff must show 1) that the employer created working conditions that are intolerable from a reasonable person's point of view, and 2) that the employer did so with the intent of forcing the employee to quit. *Logan v. Denny's, Inc.*, 259 F.3d 558, 568 (6th Cir. 2001). As for the first requirement, "[i]n order to maintain an action for constructive discharge, [a plaintiff] must show that 'working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 887 (6th Cir. 1996) (quoting *Held v.*

---

[46] Defendant makes no other arguments regarding any of the elements of the *prima facie* case or the *McDonnell Douglas* burden shifting analysis, and it focuses its argument entirely on the lack of an adverse employment action. (Doc. No. 37 at 18-19). Therefore, Defendant has only shifted the burden on the indirect evidence framework in regards to whether an adverse action occurred. Because Defendant maintains that Plaintiff Condrey left of his own volition (and was not constructively discharged), Defendant has not asserted (even alternatively) a legitimate, nondiscriminatory reason for Plaintiff Condrey's constructive discharge, and therefore the burden has not shifted to Plaintiff Condrey to establish pretext.

48

*Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). The Sixth Circuit considers a number of factors to decide whether this first requirement is satisfied:

> Whether a reasonable person would have feel [sic] compelled to resign depends on the facts of each case, but we consider the following factors relevant, singly or in combination: (1) demotion; (2) reduction in salary; (3) reduction in job responsibilities; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or continued employment on terms less favorable than the employee's former status.

*Logan*, 259 F.3d at 569 (quoting *Brown v. Bunge Corp.*, 207 F.3d 776, 782 (5th Cir. 2000)). "[H]arassment so intolerable as to cause a resignation may be effected through coworker conduct." *West v. Tyson Foods, Inc.*, 374 F. App'x 624, 640 (6th Cir. 2010) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 148 (2004)). As for the second requirement, the Sixth Circuit has found an employer's intent for the employee to resign to exist when "[i]t is completely foreseeable that a reasonable person would have resigned under these circumstances." *Id.* at 573; *Presley v. Ohio Dep't of Rehab. & Correction*, 675 F. App'x 507, 515 (6th Cir. 2017) (quoting *Logan*); *Moore v. KUKA Welding Sys. & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999).

Regarding the first factor, as noted, the Court considers a number of factors in considering whether a reasonable person would have felt compelled to resign. Most of the factors do not appear to be relevant here: there was no demotion, reduction in salary, reduction in job responsibilities, reassignment to menial or degrading work, reassignment to a different supervisor, or offers of continued employment based on terms less favorable than the employee's former status. Therefore, the Court focuses on the sixth factor, "badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." *Logan*, 259 F.3d at 569. Courts have found that constructive discharge can be found by the presence of this factor alone. *See e.g.*, *Logan*, 259 F.3d at 569 (noting that the factors are "relevant[] singly or in combination"); *West*, 374 F. App'x

49

at 640 (discussing only the "badgering, harassment, or humiliation" factor); *Bender v. Gen. Dynamics Land Sys., Inc.*, No. 2:19-CV-13177, 2020 WL 4366049, at *5 (E.D. Mich. July 30, 2020) ("[T]here is precedent for finding constructive discharge where an employee is subjected to 'badgering, harassment, or humiliation' by a coworker so intolerable that it moves the employee to resign.").

The Sixth Circuit has previously explained in a factually similar case that:

> When analyzing the prong of intolerable working conditions, this court has held that "whether a reasonable person would have felt compelled to resign depends on the facts of each case, but we consider several factors, including but not limited to, reduction in salary and badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation." *Id.* Drawing all inferences in favor of Plaintiff, the record reflects that [Defendant's] employees subjected Plaintiff to humiliation through derogatory racial slurs, and pertinently, that these slurs generally went uninvestigated by [Defendant] despite Plaintiff's complaints. Further, the record demonstrates that Meyer questioned Plaintiff about her retirement on various occasions, which a jury could conclude was harassment. The district court found that none of these events would amount to evidence of an intolerable working environment. However, in *Logan v. Denny's, Inc.*, 259 F.3d 558 (6th Cir. 2001), a case with similar facts, we determined that a genuine issue of material fact remained as to whether the plaintiff was subject to intolerable working conditions. In *Logan*, management and co-workers made comments to an employee such as "We don't serve 'grits' here," "You're probably used to that 'first of the month rush,' " and "These must have been some of your people," when referring to people who did not want to pay for their food. *Id.* at 572. This court reasoned that the comments carried "an inference of invidious discrimination" in that they were made because of the employee's race, "sufficient enough to create a question of fact as to whether the comment[s were] harassing and created an intolerable atmosphere." *Id.* While this court in *Logan* acknowledged other adverse employment actions that were enough to satisfy the constructive discharge inquiry, including demotion and salary and responsibility reduction, it went on to analyze the racially motivated comments in isolation and concluded that they were enough to create a fact question of whether the plaintiff was subject to an intolerable work environment. *Id.* Similarly, in this case, the comments made to Plaintiff by her coworker, on their own, carried an inference of invidious discrimination as they were even more explicit than those made in *Logan*. They were overt comments that clearly concern Plaintiff's race and national origin. While management did not make those comments, viewing the evidence in a light most favorable to Plaintiff requires the finding that management failed to investigate the comments when Plaintiff informed them of such, thus unreasonably failing to respond to the coworker harassment. *Cf. Hawkins v. Anheuser–Busch, Inc.*, 517 F.3d 321, 341 (6th

50

Cir. 2008) (concluding that summary judgment was improper when the evidence showed that employer failed to investigate harassment complaints). Further, the record shows that *Meyer* questioned Plaintiff regarding her retirement on several occasions. Unlike our case of *Lindsey v. Whirlpool Corp.*, 295 Fed. Appx. 758, 770–71 (6th Cir. 2008), where the plaintiff was subjected to similarly discriminatory comments but her employer promptly investigated and addressed the comments, [Defendant] generally failed to investigate Plaintiff's complaints. Accordingly, a genuine issue of material fact remains as to whether these comments constituted harassment and humiliation strong enough to compel resignation and whether any failure to investigate contributed to a constructive discharge.

*Lee v. Cleveland Clinic Found.*, 676 F. App'x 488, 495–96 (6th Cir. 2017) (footnote omitted); *see also Fite*, 686 F. Supp. 2d at 751-51.

While Plaintiff Condrey worked at Mathews Nissan, he was called "Squanto" and "Chief" in reference to his Native American heritage by other employees. (Doc. No. 42 at ¶¶ 33-34; Doc. No. 45 at ¶ 26). He states that he found a monkey with a noose around its neck in his desk, the day after his African American fiancée picked up his paycheck at Mathews Nissan. (Doc. No. 42 at ¶ 61; Doc. No. 41 at 11). The Court has additionally previously outlined (in connection with Plaintiff Brown's discriminatory termination claim) the (disputed and undisputed) racist language that was used by supervisors and other employees in the workplace. Three days after the incident where Plaintiff Brown (and, as discussed below, Plaintiff Jordan) were terminated, on July 20, 2018, Plaintiff Condrey stood up in a sales meeting to address the hostile work environment at Mathews Nissan; he then resigned his employment. (Doc. No. 42 at ¶¶ 94-96). Plaintiff Condrey stated that he felt like he had no other option than to resign due to the racism present in the work environment. (Doc. No. 45 at ¶¶ 77, 78). These events serve to create a genuine dispute of material fact regarding whether an employee in Plaintiff Condrey's position would have felt compelled to resign due to "badgering, harassment, or humiliation." *Logan*, 259 F.3d at 569.

Plaintiff Condrey must also show that the employer intended for him to quit or "[i]t is completely foreseeable that a reasonable person would have resigned under these circumstances." *Logan*, 259 F.3d at 569. In the same case quoted at length above, the Sixth Circuit explained that:

> With regard to the second prong of constructive discharge, the employer's intention to force the employee to quit, a reasonable juror could find that Meyer intended to question Plaintiff repeatedly about her retirement plans because she was an older employee who may be more likely to retire and that she did so with the intention that Plaintiff quit her job. A reasonable juror could further find that [Defendant] intended not to investigate Plaintiff's claims of age, race, and national origin discrimination because it wanted Plaintiff to leave her job. Those findings will hinge upon credibility determinations. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether [s]he is ruling on a motion for summary judgment or for a directed verdict." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Thus, factual questions remain for a reasonable jury to answer with regard to constructive discharge and Plaintiff has established this element of her *prima facie* case.

*Lee*, 676 F. App'x at 496; *see also West*, 374 F. App'x at 640 ("Again, there was sufficient evidence for a jury to conclude that [Plaintiff's] resignation was foreseeable and even to be anticipated. It is foreseeable that, after weeks of continuous physical and verbal harassment that goes unaddressed, an employee in [Plaintiff's] position would choose to resign. Further, it cannot be said that [Plaintiff] 'assumed the worst' or 'jumped to conclusions' . . . an employee subject to continuous verbal and physical harassment is not 'jumping to conclusions' when she resigns under those conditions.").

Here, Plaintiff Condrey reported the racist language and/or conduct, and Ms. Yarbrough merely replied that there "had been no response or investigation of the issues." (Doc. No. 45 at ¶¶ 74, 79). The Court has also previously noted that there is dispute between the parties regarding the extent to which Defendant investigated the "monkey and noose" incident, and that ultimately some of Plaintiff Condrey's complaints were written down on a paper plate by Mr. Hall at the sales meeting where he resigned. (Doc. No. 45 at ¶ 75; Doc. No. 42 at ¶¶ 67, 69, 70). As in *Lee*, "[a]

reasonable juror could further find that [Defendant] intended not to investigate Plaintiff's claims of age, race, and national origin discrimination because it wanted Plaintiff to leave her job." 676 F. App'x at 496. Therefore, the Court finds that there is a genuine dispute of material fact on this issue. Because Plaintiff Condrey has shown a genuine dispute of material fact on the elements of a constructive discharge, the Court finds that he should be able to proceed to trial on this issue. As a result, because this was the only element of the indirect evidence framework challenged by Defendant, Plaintiff Condrey's indirect case survives the Motion.

As the Court has determined that Plaintiff Condrey has shown a genuine dispute of material fact regarding whether he was constructively discharged, the Court will turn to the evidence of direct discrimination.[47] The Court already has set forth (above) the language that could be used to show direct evidence of discrimination. By the same token, the Court also has excluded from consideration some of the comments (including references to "Squanto" and "Chief" in regards to Plaintiff Condrey's heritage) made by co-workers who were not supervisors and lacked authority to hire/fire.[48] Though none of the language identified above as direct evidence was directed at Plaintiff Condrey, and Plaintiff Condrey was not present at Plaintiff Brown's firing, this does not

---

[47] As noted above, though the Court has found that Defendant has not succeeded in showing that it is entitled to summary judgment on Plaintiff Condrey's indirect-evidence theory (thus meaning that the discriminatory termination survives, at least to the extent based on such theory), the Court discusses the direct-evidence theory because Defendant conceivably could be successful with respect to a direct-evidence theory in particular, whereupon the Court could issue a Fed. R. Civ. P. 56(g) order pronouncing that Plaintiff Condrey cannot proceed at trial on a direct evidence theory as he can with an indirect-evidence theory.

[48] Though statements made by coworkers are relevant to the constructive discharge analysis, the Court has already noted that the language should not be considered under the separate framework for direct evidence of discrimination, which instead focuses on the language of supervisors with authority over the plaintiff.

53

preclude the Court from finding that there is direct evidence of discriminatory termination of Plaintiff Condrey.

The Sixth Circuit has deemed repeated racial slurs used by persons with authority to be direct evidence, even when the slurs are not directed at the plaintiff. *Talley v. Bravo Pitino Rest., Ltd.*, 61 F.3d 1241, 1249 (6th Cir. 1995), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). "Discriminatory statements may reflect a cumulative managerial attitude among the defendant-employer's managers that has influenced the decisionmaking process for a considerable time. Thus, management's consideration of an impermissible factor in one context may support the inference that the impermissible factor entered into the decisionmaking process in another context." *Id.* at 356; *see also Kresnak v. City of Muskegon Heights*, 956 F. Supp. 1327, 1335 (W.D. Mich. 1997) ("Direct evidence of discrimination may consist of statements made by a decision maker which show an illegal motive for employment decisions . . . Evidence of racial slurs by a manager constitutes direct evidence of racial discrimination sufficient to get the plaintiff's case to the jury." (internal quotation marks and citation omitted)); *Conti v. Am. Axle & Mfg., Inc.*, 326 F. App'x 900, 910 (6th Cir. 2009) (collecting similar case law). The Sixth Circuit has also made clear that a district court should not consider repeated racial slurs by management to be "isolated" or "abstract" so as to not constitute direct evidence. *Talley*, 61 F.3d at 1249.

Plaintiffs cite *Fite v. Comtide Nashville, LLC*, 686 F. Supp. 2d 735 (M.D. Tenn. 2010), wherein the Court found that evidence of racist comments not only supported plaintiffs' claim that they were constructive discharged, but also constituted direct evidence of discrimination sufficient to survive summary judgment:

> As to the three plaintiffs who left their jobs, the plaintiffs argue that they were "constructively discharged," that is, [the supervisor] essentially fired them by

driving them out of their jobs through constant racial harassment. Constructive discharge occurs when harassment is so intolerable as to reasonably cause a resignation. Here, in light of the allegations of constant race-based comments, jokes, and degradation, a reasonable jury could conclude that these defendants were essentially forced, by [the supervisor's] racial animus, to resign, and, therefore, these defendants also can establish a direct discrimination claim sufficient to survive summary judgment.

*Id.* at 751-52 (internal citations omitted).[49]

Therefore, the Court finds that Plaintiff Condrey has shown direct evidence of discrimination due to racist terms (undisputedly) used by Mr. Hall and (allegedly but disputedly) used by Mr. Yarbrough. Additionally, because Defendant dedicated itself exclusively to the argument that Plaintiff Condrey suffered no adverse employment action (a requirement of his *prima facie* case), Defendant did not carry its burden of showing that it would have acted the same absent a discriminatory motive. *Erwin*, 79 F. App'x at 899.

For the reasons discussed, the Court will not grant summary judgment on Plaintiff Condrey's claim of discriminatory termination.

### 3. *Plaintiff Jordan*

Defendant claims that Plaintiff Jordan cannot make out a claim for discriminatory termination, because he cannot show that he was subject to an adverse employment action, *i.e.,* termination. (Doc. No. 37 at 19-20). In so doing, Defendant cites Mr. Yarbrough's deposition testimony to the effect that he never told Plaintiff Jordan that he was terminated, and claims (with no apparent dispute from Plaintiffs) that a video of the relevant incident (involving Mr. Yarbrough and Plaintiffs Jordan and Brown) does not show Mr. Yarbrough telling Plaintiff Jordan that he is terminated. This is sufficient to shift the burden to Plaintiff Jordan on both his indirect evidence

---

[49] In context, the court's reference here to a "direct discrimination claim" was a reference to, more precisely, a discrimination claim *based on direct evidence.*

and direct evidence claims, as an adverse employment action is a requirement under each framework.[50] Plaintiff Jordan responds that he was fired as part of the same incident during which Plaintiff Brown was fired (indicating both that he suffered an adverse employment action and direct discrimination). (Doc. No. 41 at 25).

As noted above, Defendant claims that the video made of the relevant incident does not show Plaintiff Jordan being fired (expressly or by implication), and Defendant seems to imply that this conclusively means that Plaintiff Jordan was not in fact fired. (Doc. No. 42 at ¶ 92). Any such implication is misguided. This video helped to shift the burden to Plaintiff Jordan to raise a genuine issue as to whether he was fired, but Plaintiff meets such burden. Plaintiff Jordan testified at his deposition that Mr. Yarbrough fired him after he had stopped recording. (Doc. No. 45 at ¶ 59). Plaintiff Jordan's testimony suggests that he spoke up in support of Plaintiff Brown during the incident and thereafter walked Plaintiff Brown to his car. (Doc. No. 45 at ¶ 59). (*Id.*). Further according to Plaintiff Jordan, when he returned to the car lot after helping Plaintiff Brown, Mr. Yarbrough terminated Plaintiff Jordan by stating "[y]ou're fired, you can leave, too." (*Id.*). Facing an argument similar (in relevant respects) to the one Defendant makes here, the Court in *Pendleton* found that:

> Defendants' argument that Plaintiff's unsubstantiated testimony is insufficient to defeat summary judgment is misplaced. On a motion for summary judgment, "it must be assumed that, as [plaintiff] testified, the word[s] [were] used." *Johnson*, 117 Fed. Appx. at 455 (denying summary judgment on hostile work environment claim despite the fact that witness did not corroborate plaintiff's allegations that the

---

[50] As with Plaintiff Condrey, Defendant makes no other arguments regarding any of the elements of the *prima facie* case or the *McDonnell Douglas* burden shifting analysis, and it focuses its argument entirely on the lack of an adverse employment action. (Doc. No. 37 at 19-20). Therefore, Defendant has only shifted the burden on the indirect evidence claim regarding whether an adverse action occurred. Because Defendant maintains that Plaintiff Jordan left of his own volition (and was not terminated by Mr. Yarbrough), Defendant has not asserted (even alternatively) a legitimate, nondiscriminatory reason for Plaintiff Jordan's termination, and therefore the burden has not shifted to Plaintiff Jordan to establish pretext.

word "nigger" was used; credibility determinations are for the jury and are not appropriate at the summary judgment phase). We do not judge the credibility of the witnesses at this stage; instead, taking the facts in the light most favorable to the non-movant plaintiff, we consider whether a reasonable juror could find in plaintiff's favor.

*Pendleton*, 2016 WL 2927983, at \*10. Put differently, where a plaintiff has made a (not incredible) claim in his testimony, the Court is required to accept the claim as true at the summary judgment stage. *Continue v. American Axle and Mfg., Inc.*, 326 F. App'x 900, 909-10 (6th Cir. 2009). Therefore, the Court must credit Plaintiff Jordan's evidence that he was fired (even if it consists only of his own testimony), then ask whether a jury could find in his favor based on such evidence. And the answer to that, of course, is yes; credible evidence that Plaintiff Jordan was fired naturally and (obviously) would be sufficient to support a finding that he was fired. In sum, accepting (as it must) as true the facts to which Plaintiff Jordan testified, the Court finds that Plaintiff Jordan was fired in the same incident as was Plaintiff Brown. As a result, because this was the only element of the indirect framework challenged by Defendant, the indirect case survives the Motion.[51]

When discussing Plaintiff Brown's discriminatory termination claim, the Court previously found that the language used ("back ass," "boy," and "nigga") constitutes direct evidence that race played a part in Plaintiff Brown's termination. Because Plaintiff Jordan has introduced evidence that he was terminated as a part of this same incident, he has shown direct evidence of discrimination in his termination for the same reasons as Plaintiff Brown, since racist comments

---

[51] As noted above, though the Court has found that Defendant has not succeeded in showing that it is entitled to summary judgment on Plaintiff Jordan's indirect-evidence theory, meaning that the discriminatory termination claim survives (at least under one alternative theory), the Court discusses the direct-evidence theory because Defendant conceivably could be successful with respect to such theory in particular, in which case the Court could issue a Fed. R. Civ. P. 56(g) order pronouncing that Plaintiff Jordan cannot proceed at trial on a direct-evidence theory.

were made during the events surrounding his termination. *Pendleton*, 2016 WL 2927983, at *5; *Fite*, 686 F. Supp. 2d at 751.

As it did with respect to Plaintiff Condrey, Defendant focuses exclusively on the position that Plaintiff Jordan was not fired. The consequence of this is, among other things, that Defendant has not even attempted to show that it would have terminated Plaintiff Jordan absent any racial motivation, as it attempted to do for Plaintiff Brown.

Therefore, the Court finds that it cannot grant summary judgment in favor of Defendant on Plaintiff Brown's claim of racial discrimination.

C. Retaliation

Title VII makes it unlawful to retaliate against employees for engaging in protected conduct. 42 U.S.C. § 2000e-3(a). To state a retaliation claim, each Plaintiff must allege facts plausibly suggesting that: (1) he engaged in protected conduct under Title VII; (2) Defendant had knowledge of this protected activity; (3) Defendant thereafter took an employment action adverse to him; and (4) there was a causal connection between the protected activity and the adverse employment action. *Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). Protected conduct includes opposing any practice made unlawful by Title VII, or making a charge or testifying, assisting or participating in any manner in an investigation, proceeding, or hearing under Title VII. 28 U.S.C. § 2000e-3(a). Reporting or complaining of racist conduct to management also constitutes protected conduct. *Fite*, 686 F. Supp. 2d at 75; *Pendleton*, 2016 WL 2927983, at *8. Both discriminatory termination (discussed above) and retaliation are subject to the *McDonnell Douglas* burden shifting framework if there is no direct evidence of retaliation. *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). The Sixth Circuit has noted that "the burden of

58

establishing a *prima facie* case of retaliation is not onerous[.]" *Hatchett*, 186 F. App'x at 550 (internal quotation marks and citation omitted).

In their briefing, Plaintiffs seem to attempt the establishment only of a circumstantial case under *McDonnell Douglas*, inasmuch as they refer to the elements of their *prima facie* case without arguing that they have presented direct evidence. (Doc. No. 41 at 27); *see also DiCarlo*, 358 F.3d at 420 (finding direct evidence of discrimination but no direct evidence of retaliation and requiring plaintiff to "prove his claim through the use of circumstantial evidence"). And the Court does not discern any direct evidence of retaliation in any event. For its part, Defendant addresses Plaintiffs' retaliation claims only briefly in its Memorandum and in its Reply, when simultaneously discussing the race discrimination claims (discussed above). In their Response, Plaintiffs address Defendant's lack of argument in opposition to the retaliation claims, arguing:

> [Defendant] does not dispute that Plaintiffs engaged in protected opposition and reporting activity under the statutes and that it knew about such activity. Again, its only arguments are that Brown cannot establish pretext and that Jordan and Condrey cannot show that they were subjected to adverse employment actions. These arguments have been addressed in Section III and are disputed based on the facts set forth above. Accordingly, the Court should deny Defendant's motion as to Plaintiffs' retaliation claims.

(Doc. No. 41 at 27 (internal citations omitted)).

The first two elements of Plaintiffs' *prima facie* case appear to be unchallenged by Defendant and thus not in dispute. As for the third element, the Court has already found the existence of a genuine issue of material fact as to whether Defendant took an adverse employment action against Plaintiffs Jordan (termination) and Condrey (constructive discharge), and there is no dispute that an adverse action was taken against Plaintiff Brown (termination). There is no question that if these adverse employment actions took place, they took place after Plaintiffs engaged in the alleged protected conduct, and so there is a genuine issue of material fact as to the third element.

As for the final element, "the plaintiffs must, among other things, show 'a causal link' between a protected activity and the adverse employment action. That is, the evidence 'must be sufficient to raise an inference that the protected activity,' such as complaining to management about racial harassment, 'was the likely reason for the adverse action.'" *Fite*, 686 F. Supp. 2d at 753 (quoting *Wade v. Knoxville Utilities Bd.*, 259 F.3d 452, 463 (6th Cir. 2001)). "The burden of proof at the *prima facie* stage is minimal; all the plaintiff must do is put forth some credible evidence that enables the court to deduce that there is a causal connection between the retaliatory action and the protected activity." *Dixon v. Gonzales*, 481 F.3d 324, 333 (6th Cir. 2007).

The Sixth Circuit has held that the causal link can be inferred at the summary judgment stage when the adverse employment action and the protected conduct occur close in time:

> With regard to the last element, establishment of a "causal connection" between the protected activity and the adverse employment action, "[a]lthough no one factor is dispositive in establishing a causal connection, evidence . . . that the adverse action was taken shortly after the plaintiff's exercise of protected rights is relevant to causation." *Nguyen*, 229 F.3d at 563. In fact, this Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise. *See, e.g.*, *Brown v. ASD Computing Ctr.*, 519 F. Supp. 1096, 1116 (S.D. Ohio 1981) ("where there is no direct proof of a retaliatory motive, retaliation may be imputed if the timing of the retaliatory act is such as to allow an inference of retaliation to arise"), *aff'd sub nom. Brown v. Mark*, 709 F.2d 1499 (6th Cir.1983); *see also Nguyen*, 229 F.3d at 567 (noting that there are instances in which "evidence of temporal proximity alone would be sufficient to support" an inference of a causal link); *Parnell v. West*, No. 95–2131, 1997 WL 271751, at *3 (6th Cir. May 21, 1997) (noting that although "[a] time lag of seven months does not necessarily support an inference of a causal link[,] previous cases that have permitted a *prima facie* case to be made based on the proximity of time have all been short periods of time, usually less than six months").

> Various of our sister circuits have also accepted this concept. *See, e.g.*, *Oliver v. Digital Equip. Corp.*, 846 F.2d 103, 110 (1st Cir.1988) (employee's discharge "soon after" engaging in protected activity "is indirect proof of a causal connection between the firing and the activity because it is strongly suggestive of retaliation"); *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 731 (9th Cir.1986) ("[c]ausation sufficient to establish a prima facie case of unlawful retaliation may

60

be inferred from the proximity in time between the protected action and the allegedly retaliatory discharge"); *Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir.1982) ("causal connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action"); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980) ("proof of causal connection can be established indirectly by showing that protected activity is followed by discriminatory treatment").

*DiCarlo*, 358 F.3d at 421. In *DiCarlo*, the Sixth Circuit found that granting summary judgment on a retaliation claim was inappropriate when 21 days elapsed between the filing of an EEOC complaint and the plaintiff's termination, finding that "the temporal proximity between the two events is significant enough to constitute indirect evidence of a causal connection so as to create an inference of retaliatory motive." *Id.* at 421-22. The Sixth Circuit subsequently provided clarification in response to confusion post-*DiCarlo* regarding the circumstances under which plaintiffs must present other evidence of retaliation in addition to temporal proximity:

> Where an adverse employment action occurs very close in time after an employer learns of a protected activity, such temporal proximity between the events is significant enough to constitute evidence of a causal connection for the purposes of satisfying a prima facie case of retaliation. But where some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality.

> The reason for this distinction is simple: if an employer immediately retaliates against an employee upon learning of his protected activity, the employee would be unable to couple temporal proximity with any such other evidence of retaliation because the two actions happened consecutively, and little other than the protected activity could motivate the retaliation. Thus, employers who retaliate swiftly and immediately upon learning of protected activity would ironically have a stronger defense than those who delay in taking adverse retaliatory action.

*Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008) (internal citation omitted). Therefore, in the Sixth Circuit, if an adverse employment action is extremely close in time to protected conduct, such temporal proximity by itself is adequate evidence of causal connection to

survive a defendant's motion for summary judgment; if a period of time elapses, however, the plaintiff must produce evidence of additional discriminatory conduct.

Here, Plaintiffs Brown and Jordan left their employment with Defendant on July 17, 2018, and Plaintiff Condrey left his employment on July 20, 2018.[52] It is undisputed that all three Plaintiffs were hired in the summer of 2018: Plaintiff Condrey began work on June 25, 2018, Plaintiff Jordan began work on June 27, 2018, and Plaintiff Brown began work on July 3, 2018. (Doc. No. 45 at ¶¶ 4, 5; Doc. No. 36-7 at 14). It is also undisputed that throughout their short tenures at Mathews Nissan, all three Plaintiffs reported racist conduct and/or comments. The day before his termination, Plaintiff Brown reported the "monkey and noose incident" to Ms. Yarbrough.[53] (Doc. No. 42 at ¶ 64). The day before his termination, Plaintiff Condrey emailed Ms. Yarbrough to complain about the hostile work environment and lack of investigation, to which Ms. Yarbrough responded that there "had been no response or investigation of the issues."[54] (Doc. No. 45 at ¶¶ 74, 79). Under Defendant's policy, Plaintiffs Condrey and Jordan both specifically reported Mr. Hall's frequent use of the "n-word." (*Id.* at ¶¶ 29, 30, 31). Plaintiff Brown testified

---

[52] As the Court has previously noted, the circumstances of Plaintiff Jordan's last day at the dealership (namely, whether he left of his own volition or was terminated) are in dispute. Plaintiff Condrey has presented evidence that he was constructively discharged.

[53] Although Ms. Yarbrough is not a supervisor of Plaintiffs, she appears to qualify as "management." Ms. Yarbrough is the daughter of Defendant's owner, Gary Mathews. (Doc. No. 45 at ¶ 3). She is currently the Human Resources Manager at Mathews Nissan, Inc, though she was not at the time of the events giving rise to this case. (*Id.*; Doc. No. 36-7 at 6). Defendant does not seem to dispute that emailing Ms. Yarbrough qualified as reporting racist conduct and/or comments. Ms. Yarbrough forwarded Plaintiff Brown's email to Mr. Yarbrough, his supervisor, and responded to Plaintiff Condrey's email.

[54] Defendant disputes this, but Defendant includes the same factual recitation that it used on statements related to Plaintiff Brown reporting racist conduct and/or comments, not Plaintiff Condrey, and points the Court to no facts that put this complaint by Plaintiff Condrey into dispute. (Doc. No. 45 at ¶ 74).

in his deposition that he tried several times to report Mr. Hall's use of the "n-word," but two employees ignored his call, email, and physical note regarding Mr. Hall's conduct. (Doc. No. 36-1 at 14, 119-121, 164).

Although there is no evidence of exactly when each Plaintiff reported (or attempted to report) Mr. Hall's use of the "n-word," the fact that each Plaintiff worked at Mathews Nissan only for a short time indicates that these reports occurred close to their termination dates. Plaintiff Brown's attempts would have been made sometime within the two weeks before his firing, Plaintiff Jordan's report would have been made sometime within the three weeks before his firing, and Plaintiff Condrey's report would have been made sometime within the four weeks before his firing. Plaintiff Condrey and Plaintiff Brown each reported additional discriminatory conduct (the general hostile work environment and for the "monkey and noose incident," respectively) to Ms. Yarbrough the day before they suffered their alleged adverse employment actions. Based on the close temporal relationship, the Court finds that these two Plaintiffs' have raised a genuine issue of material fact as to the existence of the final element of their *prima facie* case for retaliation. As for Plaintiff Jordan, his reporting Mr. Hall's epithet could have occurred (as far as the current record shows) up to three weeks before his firing, which is perhaps temporally too remote for the temporal connection by itself to support his claim of retaliation. However, Plaintiffs have presented additional circumstantial evidence that causation is present for all three Plaintiffs, such as the frequent racist language of supervisors, including during the incident whereby Plaintiffs Brown and Jordan were terminated. *Mickey*, 516 F.3d at 526 ("[S]uch other evidence of retaliatory conduct has commonly included evidence of additional discrimination occurring between the date at which the employer learned of the protected activity and the date of termination or other adverse employment action.").

Because Plaintiffs have set forth sufficient evidence to reach the jury on a *prima facie* case under *McDonnell Douglas*, the burden of production shifts to Defendant to show a legitimate reason for firing Plaintiffs. As the Court has previously noted, Defendant did not brief (or point to evidence) that it would have fired Plaintiffs Condrey and Jordan even absent a discriminatory motive, maintaining instead simply that neither was (actually or constructively) discharged. Similarly, Defendant also did not brief (or point to evidence of) legitimate reasons for firing Plaintiffs Condrey and Jordan. Therefore, Defendant has failed to meet its burden of production in respect to legitimate, nondiscriminatory reasons for the (alleged) termination and constructive discharge of Plaintiffs Condrey and Jordan, respectively. As for Plaintiff Brown, the Court has previously discussed that although Defendant has produced evidence of a legitimate, nondiscriminatory reason for terminating Plaintiff Brown, Plaintiff Brown has shown that there is a genuine dispute of material fact as to pretext.

For the reasons discussed, which in various respects track those laid out in the race discrimination discussion, the Court finds that it cannot grant summary judgment in favor of Defendant on Plaintiffs' retaliation claims.

D. Hostile work environment

Each Plaintiff must establish five elements for a hostile work environment claim: 1) he is a member of a protected class; 2) he was subjected to unwelcomed racial harassment; 3) the harassment was based on race; 4) the harassment created a hostile work environment; and 5) the existence of employer liability.[55] *Hafford v. Seidner*, 183 F.3d 506, 512 (6th Cir. 1999); *Pendleton*,

---

[55] There is an affirmative defense available to a defendant when they have taken reasonable care to prevent and to correct harassment and the plaintiff did not avail themselves of the employer's procedures to address harassment. *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 452 (6th Cir. 2004). However, Defendant in this case has not raised this affirmative defense. The Court therefore will not consider it.

2016 WL 2927983, at *10. "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotation marks and citations omitted). The harassment must be both objective and subjectively offensive to constitute a Title VII violation. *Id.* at 21-22. When looking at a hostile work environment claim, a court should employ a totality of the circumstances test. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999) (discussing *Harris*). "A court determines whether a hostile work environment has been created 'by looking at all the circumstances . . . includ[ing] the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Bradley v. Arwood*, 705 F. App'x 411, 422 (6th Cir. 2017) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "Whether conduct is severe or pervasive is 'quintessentially a question of fact.'" *Jordan v. City of Cleveland*, 464 F.3d 584, 597 (6th Cir. 2006) (*O'Shea v. Yellow Tech. Servs., Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999)). The fact-intensive nature typically makes "the severity and pervasiveness evaluation . . . particularly unsuited for summary judgment." *O'Shea*, 185 F.3d at 1098.

Some of the elements of a hostile work environment claim appear to be unchallenged by Defendant and thus not in dispute. The Court has already discussed that all three Plaintiffs were members of a protected class. The parties also do not appear to dispute that Plaintiffs' alleged harassment was based on race, as the parties agree that the hostile work environment claim is based on racist language in the workplace. Finally, there does not seem to be any dispute that the employer would be liable to the extent Plaintiffs could establish all other elements, as the conduct

65

(racist language) was committed by Mr. Yarbrough and Mr. Hall, supervisors who worked for Defendant and had authority over Plaintiffs.[56]

Defendant argues that the use of the "n-word" was not frequent enough to be "severe" or "pervasive." (Doc. No. 37 at 21). However, "[c]ase law makes clear that the use of the word 'nigger,' even taken in isolation, is not a 'mere offensive utterance.'" *Johnson v. United Parcel Serv., Inc.*, 117 F. App'x 444, 454 (6th Cir. 2004) (quoting *McGinest v. GTE Serv. Corp.*, 360 F.3d 1103, 1116 (9th Cir. 2004) and *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 185 (4th Cir. 2001)); *see also Pendleton*, 2016 WL 2927983, at *11. The Sixth Circuit has emphasized that when the "n-word" is used by a manager the severity is "greatly increased." *Id.*; *see also Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 675 (7th Cir. 1993) ("Perhaps no single act can more quickly alter the conditions of employment and create an abusive working environment, than the use of an unambiguously racial epithet such as 'nigger' by a supervisor in the presence of his subordinates." (internal citation and quotation marks omitted)).[57]

Plaintiffs claim in their briefing, with citation to supporting testimony and the statement of facts, that Mr. Hall used the "n-word" and its variants frequently in the workplace and that Mr. Yarbrough used the "n-word" in the workplace. (Doc. No. 42 at ¶¶ 20, 21, 22; Doc. No. 41 at 16).

---

[56] In their interrogatories, Defendant states that Mr. Hall, as the sales manager, and Mr. Yarbrough, as the General Manager, were supervisors for all three Plaintiffs. (Doc. No. 36-7 at 13). This does not appear to be in dispute. "Under the fifth element, employer liability is established if the harassment was by a supervisor; if the harassment was by co-workers, then there is employer liability if the employer had actual or constructive knowledge of the harassment." *Johnson v. United Parcel Serv.*, Inc., 117 F. App'x 444, 453 (6th Cir. 2004); *see also Fite*, 686 F. Supp. 2d at 752 ("If the hostile work environment is created by a supervisor with authority over the complaining employee, the employer is vicariously liable for the hostile work environment.").

[57] The Court would be unsurprised if readers felt a great discomfort, or worse, just at seeing the "n-word" spelled out in full here. The existence of such a reaction would reflect the perhaps unique ability of this word singlehandedly to create a hostile work environment.

The Court finds that multiple uses of the "n-word" by two different managers is sufficient for Plaintiffs to raise a genuine issue as to the pervasiveness or the severity of the alleged hostile and harassing conduct.[58]

Because some of Plaintiffs' cited uses of the "n-word" were merely overheard or not directed at Plaintiffs, Defendant argues that the references do not constitute a hostile work environment. (Doc. No. 37 at 22). The Sixth Circuit has rejected this argument, calling an "overheard" use of the "n-word" by the division manager to a co-worker an "incident that clearly established racial harassment." *Johnson*, 117 F. App'x at 455. The Sixth Circuit rejected the defendant's argument that the division manager may have been using the word to admonish another employee not to use the word (since the one overhearing the word was not certain of the context), and instead resolved the factual dispute in favor of plaintiff and did not grant summary judgment on the issue. *Id.* Thus, instances of racist language may be less probative or severe if the language is merely overheard by the plaintiff, but "this Court has made clear that a comment need not be 'directed at' a plaintiff, in order to constitute harassment." *Id.* at 456. This Court similarly rejects Defendant's arguments regarding these uses of the "n-word."

Defendant also tries to argue that "Plaintiffs have offered no proof as to why these instances interfered with their ability to do their job and sell cars." (Doc. No. 37 at 23). However, element four of the *prima facie* case, though often phrased as "the harassment unreasonably interfered with her work performance *and* created a hostile work environment," does not require specifically that

---

[58] The parties also both briefed the "monkey and noose incident" as evidence of a hostile workplace. (Doc. No. 41 at 18; Doc. No. 37 at 23-24). Since the Court finds that the alleged repeated use of the "n-word" by two supervisors is more than enough for Plaintiffs' hostile work environment claim to survive summary judgment, the Court does not decide whether the "monkey and noose incident" can be attributed to Defendant when it is uncertain who placed the monkey and noose in Plaintiff Condrey and Plaintiff Brown's desk.

a plaintiff show that their work performance suffered, as courts employ a totality of the circumstances test when analyzing element four. *Kasprzak v. DaimlerChrysler Corp.*, 395 F. Supp. 2d 636, 641 (N.D. Ohio 2005) ("Plaintiff need not show specifically that her work performance suffered."); *Pendleton*, 2016 WL 2927983, at *10 (not considering whether the plaintiff's work performance had been negatively impacted and finding that a plaintiff's testimony that they were subject to unwanted racial harassment by a supervisor was sufficient to raise a genuine issue of material fact as to prong number four of the *prima facie* case of a hostile work environment claim); *see also Bradley*, 705 F. App'x at 417 (stating the *prima facie* case for hostile work environment as "(1) she was a member of a protected class; (2) she was subjected to unwelcome harassment; (3) the harassment was based on race; and (4) the harassment unreasonably interfered with her work performance or created a hostile *or* offensive work environment that was severe and pervasive." (emphasis added)). The Supreme Court has also indicated that a plaintiff is not required to show that their work was negatively impacted, stating:

> A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers. Moreover, even without regard to these tangible effects, the very fact that the discriminatory conduct was so severe or pervasive that it created a work environment abusive to employees because of their race, gender, religion, or national origin offends Title VII's broad rule of workplace equality.

*Harris*, 510 U.S. at 22. As the Court has already found that the use of the "n-word" (undisputedly used by Mr. Hall and disputedly used by Mr. Yarbrough) and its variants multiple times was enough to constitute a hostile work environment under the totality of the circumstances test, the Court is not persuaded by Defendant's argument that Plaintiffs also had to show that their work performance was effected.

68

Finally, Defendant seems to argue that Plaintiffs were not offended by the use of the "n-word," so the use of the word could not create a hostile work environment; the gist of this argument seems to be that the use of the "n-word" was not subjectively offensive to Plaintiffs and therefore not a violation of Title VII. (Doc. No. 37 at 22). Defendant cites to Plaintiff Brown's testimony where he stated that Mr. Hall appeared to be using the "n-word" as a "term of endearment." However, Defendant takes Plaintiff Brown's testimony out of context. Plaintiff Brown testified that Mr. Hall "didn't use [the "n-word"] in a manner like he was putting somebody down . . . it was like a term of endearment." (Doc. No. 36-1 at 14). He then testified that he did not believe that *Mr. Hall* perceived *his own comments* as derogatory or a put down to African American individuals and instead perceived them as a term of endearment. (*Id.*). But when asked whether *Plaintiff Brown* perceived Mr. Hall's comments as derogatory, Plaintiff Brown responded: "What do you think? I'm a black man from the south. Do you want to call me nigger and then we'll find out. Hell, yeah, I took it [as] offensive." (*Id.*). Despite Defendant's contention that Plaintiffs were not offended by the use of the "n-word," Plaintiffs have repeatedly indicated that they found the use of the "n-word" or other racist language to be offensive, and they each reported (or attempted to report) the use of the word. (*Id.* at 14, 119-121, 164; Doc. No. 36-2 at 11; Doc. No. 36-3 at 12; Doc. No. 45 at ¶¶ 29, 30, 31). In short, even if Mr. Hall did not intend to be offensive, and even if Plaintiff Brown knew that Mr. Hall did not intend to be offensive, Plaintiff Brown testified (in what hardly qualifies as a shocker) that it was offensive to him. And Defendant presented no other evidence suggesting that the racial epithets were not subjectively offensive to Plaintiffs.

For the reasons discussed, the Court will not grant summary judgment on the hostile work environment claim.

**CONCLUSION**

Some cases simply are ill-suited to summary judgment. Of course, summary judgment is about keeping a case from the jury, and some arguments are better suited *for making to* the jury than they are to *keeping a case from* the jury. To a large extent, such is the case here. With respect to all but Plaintiffs' disparate-pay claim, Defendant presents various arguments (with, in some instances, supporting evidence) that potentially could get traction with the jury but do not entitle it to summary judgment.

For the reasons discussed herein, the Court will grant in part and deny in part the Motion. The Court will grant summary judgment to Defendant on Plaintiffs' disparate treatment claims as they relate to pay. The Court will deny summary judgment to Defendant in regards to Plaintiffs' claims for discriminatory termination, retaliation, and hostile work environment.

An appropriate order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE